359 So.2d 666 (1978)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS
v.
Lloyd Robert CONSTANT et al.
No. 11940.
Court of Appeal of Louisiana, First Circuit.
May 1, 1978.
Concurring and Dissenting Opinions May 10, 1978.
Rehearings Denied June 12, 1978.
*667 Johnie E. Branch, Jr., and Bryan Miller, Executive Asst. Gen. Counsel, Baton Rouge, for plaintiff and appellant.
David Landry, C/O Deramee & Deramee, Thibodaux, for defendants and appellees.
En banc.
LANDRY, Judge.
The appeal by plaintiff (Department) in this expropriation proceeding presents the primary question of whether Louisiana Constitution, 1974, Article 1, Section 4, requires an expropriating authority to restore a landowner's business facilities to the condition existing prior to taking so that compensation may be made to the owner "to the full extent of his loss". The trial court found that the constitutional provision does so require. We agree in principle but reduce the amount of the award granted defendants (Owner).
On June 23, 1975, the Department instituted proceedings, pursuant to the "Quick Taking Statute", to expropriate three parcels of land belonging to Owner and required for construction of a new bridge and highway approaches for the State Route 307 bridge crossing of Bayou Boeuf. An initial deposit of $33,835.00 was increased to $34,594.00 on March 9, 1977.
The taking involves two of Owner's tracts situated in the northwest quadrant of the crossing. The first tract contains 1.56 *668 acres fronting on the west side of Bayou Boeuf, parallel to and abutting Highway 307. This parcel extends from the bayou westerly to a road which runs northerly from Highway 307 and then curves and runs in a generally easterly direction toward the bayou, bounding the tract on the north. Owner had converted this site into a marina of sorts by constructing a boat slip from Bayou Boeuf to a point approximately 2/3 the depth of the tract and parallel to Highway 307. Along the south side of the slip, Owner constructed a bulkhead 110 feet long. The area between the bulkhead and Highway 307 was filled and topped with shell, thus providing access to the slip from Highway 307. Near the bayou, Owner constructed a boat launching ramp for small vessels. To service vessels, Owner erected a small boat shed and a gasoline pump to which electricity was supplied by a 70 foot buried cable. The marina area is characterized as "dry land". The western end of the tract and the portion north of the boat slip is low and marshy and is considered "wet land". From this tract, the Department took Parcel P-2-6 containing .56 acres composed largely of dry land, and virtually all of the marina area including the bulkheading, a small segment from the south side of the boat slip, the launching ramp, boat shed and electric supply line. The taking also included the entire western end of the tract, composed of wet land. There remains of this tract the unaffected portion of the boat slip and all of the wet land north of the strip, comprising approximately one acre in all. This tract is unique in that it is situated on the west side of the bridge and was used as a means of loading heavy oil field rigs and equipment on barges for transportation, via Bayou Boeuf, to waterways west of the Bridge. Because of the height of the bridge, such equipment could not pass beneath the bridge on barges from any marina on the east side of the bridge.
The second tract contains 3.2 acres lying west of the first tract and also abutting Highway 307. It is separated from the first tract by the aforementioned highway running north from Highway 307. Two parcels were taken from this tract, namely, P-2-7 and P-2-7-D-1. Parcel P-2-7 contains.230 acres taken in full ownership; Parcel P-2-7-D-1 contains .002 acres obtained for a drainage servitude.
It is stipulated that Owner is due $1,323.00 for Parcel P-2-7 and $165.00 for fencing thereon. The trial court awarded severance damages of $235.75 for a long narrow remainder of P-2-7. On appeal, the Department disputes this award and Owner seeks an increase therein. It is also stipulated that the value of the servitude area comprising P-2-7-D-1 is $12.00, and that P-2-6, which comprises both dry and wet lands, is valued at $26,537.00 without the improvements thereon. All experts agree that the dry land is valued at $65,000.00 per acre and the wet lands at $6,000.00 per acre. The experts further agree that the value of the remaining wet land portion of P-2-6 is the same after taking as before, namely, $6,000.00 per acre.
The trial judge found that the bulkheading had an estimated 50 year life, of which 60% remained at taking. The Department's expert, John Dugan, set replacement cost of the bulkheading at $120.00 a linear foot, which factor he depreciated 50%, assuming this facility to be 25 years old and to have a 50 year life. Dugan gave no value to the 8 isolated pilings because of their age and his conclusion that they served no useful purpose. Dugan attributed no value to the shell surface of the marine area because he considered this factor in fixing land value. The boat shed was valued by Dugan at $100.00. Dugan found no severance damage to P-2-6.
Owner's expert, Irvin Epplington, did not visit the scene until most of the improvements had been removed. Based on replacement costs obtained from contractors, Epplington valued the bulkheading at $175.00 per linear foot. Using a 50 year life basis and depreciating same 40%, he valued the bulkheading at $11,500.00. He valued the shed and conduit at $100.00 and $270.00, respectively, predicated upon information given him about these facilities. Finding a replacement cost of $4,000.00 for the isolated *669 pilings, Epplington valued these items at $2,400.00 utilizing a depreciation factor of 40%. A value of 10 cents per square foot was given by Epplington to the shell surfacing, or $780.00, in addition to his land value of $26,537.00. Epplington found that the use of the remaining .28 acres slip area of Parcel P-2-6 was diminished two-thirds because heavy machinery could no longer be brought by truck to the slip for transportation aboard barges.
The Department's expert, Lloyd Rockhold, estimated the cost of replacing the bulkheading in a theoretical reconstruction of the marina. He determined replacement cost to be $148.00 per linear foot. The trial court accepted Rockhold's cost estimate as the most reliable in fixing the award for the bulkheading.
Claiming entitlement to restoration of the marina to substantially its former condition, Owner offered expert testimony as to the cost of reconstructing 210 feet of bulkheading with a 40 foot wing on its west end, on the north side of the boat slip. Behind the proposed bulkheading the remaining wet land area would be filled with dirt and topped with shell to provide a solid land fill affording truck access to the slip. A new boat launching ramp would also be required. Owner's expert, John Hoffman, estimated the cost of such curative work at $103,075.00, in 1975, and $113,260.00 at the time of trial in March, 1977. Rockhold estimated that the work required to convert the remainder of P-2-6 into a marina would be $62,216.00.
The trial court awarded the following for P-2-6: agreed value of land taken, $26,537.00; boat shed, $100.00; electrical conduit, $270.00; and $480.00 for the 8 isolated pilings (based on Rockhold's estimated replacement cost of $2.50 per linear foot for 8 pilings 40 feet in length, a total value of $800.00, depreciated 40%). In this manner, the trial judge awarded $27,387.00 for the land and improvements of Parcel P-2-6 that were taken.
The trial judge interpreted La.Const. 1974, Article 1, Section 4, to mean that the owner of expropriated property must be paid not only for land taken and severance damages to his remainder, but also must be compensated to the full extent of his loss; that is, be made whole and absolved from any economic loss whatever. This, according to the trial judge, obligates the Department to restore the marina. On this premise, the trial judge accepted Rockhold's estimated marina replacement cost, depreciated said amount 40% to obviate Owner's unjust enrichment, and awarded Owner additional damages of $37,329.00 as cost of cure. Additionally, the trial judge noted that reconstruction would entail "taking" the remaining wet land area of Parcel P-2-6 valued at $6,000.00 and allowed this amount as further damages.
Concerning P-2-7, the trial judge awarded the value of land and improvements, to which he added severance damages of $235.75, making a total award of $1,723.75 for this parcel. Awarding $12.00 (the stipulated value of P-2-7-D-1), the trial judge made a total award of $72,451.75, from which he deducted the deposit of $34,594.00, and rendered judgment in favor of Owner in the sum of $37,857.75.
All appraisers agreed that the value of the entire parcel from which P-2-6 was taken, including the marina, improvements and remaining wet lands was $53,000.00 before the taking. Epplington explained that in his opinion the value of the land and marina could not be determined on a market data approach because of the uniqueness of the tract and the absence of sales of similar properties from which market value could be calculated. He also stated that even if some $109,000.00 were expended to convert the remainder into a new marina as estimated by Hoffman, the completed reconversion would probably have a market value of approximately $53,000.00. He justified this expenditure on the ground it would take this amount to place Owner in his original position.
The Department contends that the trial judge erred in awarding replacement value of the marina; fixing an excessive value for the bulkheading; and awarding excessive attorney's fees. Owner has answered *670 the appeal, seeking an increase in the award of cost of cure to $65,445.00, predicated on Hoffman's estimate of $109,975.00, depreciated 40%; and, an increase in attorney's fees for having to answer and resist the Department's appeal. Owner also seeks severance damages of $554.00 to the remaining slip area of P-2-6.
The trial judge rejected Owner's claim for severance damages to the remaining slip area of P-2-6 because of lack of proof of this item. We concur in this finding because the record is barren of evidence to show income produced by the marina operation. Moreover, Owner made absolutely no attempt to establish the extent of alleged business losses.
The remainder of P-2-7 consists of a long narrow strip about 30 feet wide on one end and 9 feet wide on the other. Severance damages to this remainder are claimed based on Epplington's testimony that the tract was worth 20 cents per square foot prior to taking and 10 cents per square foot thereafter. Epplington thus depreciated the 3484 square foot remainder $348.00. The trial judge obviously rejected this contention and accepted Dugan's opinion that this remainder was undiminished in value in that it could be readily leased or sold as a campsite in this particular area where any kind of campsite would bring a premium price because of the demand for campsites by sportsmen.
La.Const.1974, Article 1, Section 4, pertinently states:
"Property shall not be taken or damaged by the state or its political subdivisions except for public purposes with just compensation paid to the owner or into court for his benefit. . . . In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss. . . ."
We find the following legislation is also pertinent to the issue at hand:
La.R.S. 19:1, as amended by Act 11, Extra Sess. 1974, which provides:
"Property defined.
As used in this part (expropriation), the term `property' means immovable property, including servitudes and other rights in or to immovable property."
La.R.S. 48:450, B, (2), as amended by Act 30, Ex.Sess.1974, provides that where a portion of a tract is expropriated, the owner may seek trial on the issue of the measure of compensation due provided, inter alia, that he answers the suit and reasonably itemizes his claim for property taken and severance damages claimed.
La.R.S. 48:453, C and E, as amended by Act 391 of 1976 provide respectively that in an expropriation proceeding, the owner shall be compensated to the full extent of his loss and that reasonable attorney's fees are recoverable by an owner in the amount of 25% of the excess of an award over the amount deposited in court by the expropriating authority.
We note also the decision rendered by a three judge panel of this court in Louisiana Power & Light Company v. Caldwell, 353 So.2d 371 (1977), in which it was concluded that La.Const.1974, Article 1, Section 4 made no change in the long established law of this state that compensation for property expropriated for public purposes is limited to market value of property taken and severance damages to the remainder, if any.
We are cognizant too, of State of Louisiana, Through Department of Highways v. Champagne, 356 So.2d 1136 (La.App. 3rd Cir., 1978), which held that La.Const. Article 1, Section 4, has changed our historical concept of compensation due the owner of expropriated property. In essence, our brothers of the Third Circuit held that the new constitutional provision has broadened the measure of damages in expropriation cases by requiring that an owner not only be paid the market value of property taken and severance damages to his remainder, but also that such an owner be put in as good a position pecuniarily as he would have been had his property not been taken.
The Department urges that the hereinabove mentioned statutes indicate clear legislative intent to limit recovery in compensation *671 cases to market value of land taken and severance damages, notwithstanding La.Const.1974, Article 1, Section 4. The Department also urges that La.R.S. 19:1 means that in an expropriation proceeding, only damages to immovable property may be recovered and that, if any other damages occur, such as loss of business, cost of moving and similar expenses or losses, they must be recovered in a separate proceeding, if at all.
Owner maintains, however, that present Constitutional Article 1, Section 4 was intended to enlarge the scope of recovery by an owner whose property is expropriated for public purposes. We find that Owner's position is correct.
We have considered in detail the delegates' discussion of amendments to proposed Article 1, Section 4, as submitted to the Constitutional Convention by the committee which drafted the provision. Numerous amendments were offered when the Committee provision came before the convention for adoption; virtually all proffered amendments were rejected and the committee's submitted version adopted with no significant change. The arguments posed in opposition to proposed amendments make it clear beyond doubt that the intent of the submitted Article was to enlarge, liberalize, and expand the scope of the "just and adequate compensation" measure of damages contained in the Constitution of 1921, by inclusion of the phrase "the owner shall be compensated to the full extent of his loss" so that his award for property value and severance damages would not be eroded to the extent of such expenses incurred by him in litigating the damages due.
The debate and discussion notes that the new constitutional provision was patterned upon a similar provision in the constitutions of Montana and other states.
In this regard, we note the committee comment appearing in the Records of the Louisiana Constitutional Convention of 1973, Convention Transcript, Volume I, 11th day proceedings, July 6, 1973, page 86, to the effect that "The term `full extent of the loss' is intended to permit an owner whose property has been taken to remain in equivalent financial circumstances after the taking".
The explanation of Delegate Lanier, when the article was before the convention for final adoption, indicates that the provision "full extent of the loss" was meant to cover elements of damage formerly considered damnum absque injuria, such as costs of removal and similar costs. Records of the Louisiana Constitutional Convention of 1973, Convention Transcript VII 46th days proceedings, September 13, 1973, pages 1240-1242.
In an article entitled The Declaration of Rights of the Louisiana Constitution of 1974, 35 La. Law Rev. 1 (1974), Professor Lee Hargrave, in considering the effect of La.Const.1974, Article 1, Section 4, observed:
"The new formula comes from the 1972 Montana Constitution, and was stated by the committee in comments as `intended to permit the owner whose property has been taken to remain in equivalent financial circumstances after the taking'." (35 La. Law Rev. at 15)
Professor Hargrave aptly noted:
"No doubt this provision will spawn much litigation, but it is clear that the level of expropriation awards must be expanded to include moving expenses, business losses because of change of location and compensation for some intangible losses not covered under prior law."
We find no merit in the Department's argument that the hereinabove mentioned legislation adopted subsequent to the effective date of La.Const. 1974, Article 1, Section 4, shows intent to retain the former measure of compensation due for expropriated property. In determining constitutionality, legislation may be persuasive but is never controlling upon the courts. The function of interpreting the constitution and laws of the state, in final analysis, rests exclusively upon the courts. La.Const.1974, Article 5, Section 1.
*672 In view of the language employed in Article 1, Section 4, we conclude that the Article broadens the scope and concept of the measure of damages recoverable in expropriation cases. The committee's explanation of the Article submitted to the full convention and the debate on the proposed amendments thereto, make clear the intent to allow recovery for items and elements of damages not previously compensable. We also find that the provision envisions recovery for business losses, moving expenses and other intangibles in a proper case and upon adequate proof of such losses. We deem it elementary, however, that recovery for such items must depend upon the facts, circumstances and proof offered in each individual case. We reverse Louisiana Power and Light Company v. Caldwell, above, insofar as it holds contrary to the views herein expressed.
Owner produced no proof of market value based on sales of comparable property, claiming that no such comparables existed. Significantly, Owner made no effort to prove the value of the business and property from an income approach. Presumably, Owner had records to establish such value. Owner was content to offer proof only of reconstruction cost at a particular location. It could well be that a similar business could be relocated elsewhere at less cost.
In view of the conclusions hereinafter reached, we pretermit consideration of the Department's claim that the trial judge's award of $480.00 for the isolated pilings and $270.00 for the electrical conduit on P-2-6 was excessive. We also pretermit Owner's claim that the award for the piling should be increased.
We find that the record amply supports the trial judge's award of $235.75 as severance damages to Parcel P-2-7. For this reason, we decline to either eliminate this award as requested by the Department or increase it as urged by Owner.
The trial judge awarded Owner a total of $70,716.00 for the taking of P-2-6, itemized as follows: Agreed value of land, $26,537.00, depreciated replacement cost of new facility, $37,329.00 (based on Hoffman's estimates); boat shed, $100.00; electrical conduit, $270.00; isolated pilings, $480.00; and, value of remaining land used for replacement, $6,000.00. We find this award constitutes an excess.
We find that Owner is entitled to recover for the loss of his marina operation in order to obtain compensation to the full extent of his loss. We find, however, that such loss cannot reasonably exceed the value of the marina, less the value of the remaining property. It has been noted that this entire tract, with all improvements thereon, was valued at $53,000.00 before the taking and that the remainder has an agreed value of $6,000.00. We find that Owner is therefore entitled to damages in the sum of $47,000.00 for the taking of P-2-6. The trial court's award would have amounted to $17,716.00 more than the value of the entire property before the taking, notwithstanding the remainder value of $6,000.00. We find that our award will place Owner in the same pecuniary position he enjoyed prior to the taking. We also find that in this case, any award greater than that granted would constitute an economic waste. We deem it inappropriate to require payment of damages greater than the established value of property utilized as a going business in the absence of proof of business losses. Since it is agreed that P-2-6 has a value of $26,537.00, Owner is entitled to the additional sum of $20,463.00, the difference between the value of the part taken and the $47,000.00 value of the tract.
We affirm the trial judge's award of $1,723.00 for Parcel P-2-7 consisting of $1,323.00 for land taken; severance damages of $235.00; and $165.00 for improvements. We also affirm the award of $12.00 for Parcel P-2-7-D-1.
We thus fix Owner's award at $48,735.00. Since the deposit was $34,594.00, attorney's fees are deducted to 25% of $14,141.00, the difference between the deposit and the total award. La.R.S. 48:453(E), as amended. Interest is due Owner in the sum of $90.10 for $790.00 not deposited until March 7, *673 1977. Owner is also due interest on $13,346.00 at 7% from June 23, 1975, and all costs of these proceedings.
It is ordered, adjudged and decreed that the judgment of the trial court be and the same is hereby amended to reduce the total award to Owner to the sum of $48,735.00, and judgment rendered herein in favor of Owner in the additional sum of $14,141.00, together with $90.10 interest and additional interest at 7% per annum on $13,346.00 from June 23, 1975, until paid and the further sum of $3,535.25 as attorney's fees, and all costs of these proceedings.
It is further ordered, adjudged and decreed that except as herein amended, the judgment of the trial court is affirmed.
Amended and affirmed.
LOTTINGER, Judge, concurring and dissenting.
I concur in the conclusion reached by the majority of this Court that Article 1, Section 4, La.Const.1974 broadened the scope and the concept of the measure of damages recoverable in expropriation cases vis-a-vis the 1921 Louisiana Constitution.
However, I dissent from the majority's ultimate conclusion that the most the landowner-defendant can receive in compensation is the value of the property at the time of the taking, and that any greater award would amount to an economic waste. The majority's conclusion only gives lip service to the intentions of the delegates to the convention.
I am convinced that the delegates to the Constitutional Convention intended that the defendant-landowner not suffer any financial loss or out of pocket expenses because of the expropriation of his property.
It was not the intention of the delegates in subordinating the rights of private ownership of property to the paramount right of the state to expropriate for the public good that the individual be forced to suffer financially. Stated another way, with the right of expropriation goes the responsibility and obligation to made the individual whole. For example, if land with a twenty year old building is expropriated, the landowner should receive the fair market value of the land plus the reconstruction cost of the building, without deducting depreciation, plus any additional proven expenses as compensation. Otherwise, if the landowner receives any less, it will be necessary for him to pay these expenses out of his own pocket, and this I believe the delegates did not intend.
In the instant case, the landowner should receive the value for all land taken, excluding the improvements, and as compensation for the improvements, he should receive the replacement or reconstruction cost thereof, without regard to depreciation, as of the date of the taking.
The majority would allow as to P-2-6 an award of $47,000.00. They compute this figure by reasoning that the entire tract was valued at $53,000.00 before the taking. The land without improvements was valued at $6,000.00 per acre and since P-2-6 contained 1.56 acres, but only .56 acres was being taken, they deducted $6,000.00 from the total valuation.
Thus, the majority allows $47,000.00 for the taking of the marina, whereas the Department's own expert testified that it would cost $62,216.00 to reconstruct the marina. For the defendant to reconstruct his marina, he must spend $15,216.00 out of pocket money in addition to the expropriation award. This certainly cannot be what the delegates envisioned by "to the full extent of his loss".
It is apparent in carefully analyzing the trial judge's award that there is some duplication in the award. As to P-2-6, the trial judge awarded $26,537.00 as the agreed value of the land taken. This value presumably includes the fill and bulkheading. However, after making this award for this .56 acres including fill and bulkheading, the trial judge then awarded $37,329.00 as the depreciated replacement cost of the marina based on figures of the Department's expert. This last figure would include cost of bulkheading and fill, thus a duplication. Included in the $26,537.00 award is also the value for the unimproved land, i. e., .56 *674 acres worth $3,360.00. Additionally, after paying for the land taken, the trial judge awarded $6,000.00 for the owner's land on which the new facility would be built. This should not be allowed. The proper award for P-2-6 is .56 acres at $3,360.00; a boat shed at $100.00; electrical conduit at $270.00; eight isolated pilings at $800.00; and reconstruction of marina based on the Departments figures at $62,216.00; or a total for P-2-6 of $66,746.00.
I find no error in the award of $1,735.75 for P-2-7 and P-2-7-D-1.
Therefore, the total award to the defendant-landowner is $68,481.75 and the attorney fees should be reduced to 25 per cent of $33,887.75, the difference between $68,481.75 and the amount of the deposit, $34,594.00.