369 So.2d 699 (1979)
STATE of Louisiana Through the DEPARTMENT OF HIGHWAYS
v.
Lloyd Rodney CONSTANT et al.
No. 62625.
Supreme Court of Louisiana.
March 5, 1979.
Rehearing Denied April 9, 1979.
*700 Deramee & Deramee, David L. Landry, Thibodaux, for defendant-respondent.
William W. Irwin, Jr., Johnnie E. Branch, Jr., Edward A. Michel, Bryan Miller, State Dept. of Highways, Baton Rouge, for plaintiff-applicant.
*701 TATE, Justice.[*]
By the taking, the state highway department expropriated the entire loading and parking area of a marina operation conducted by the defendant landowners. The essential issue before us is:
Under the new constitutional provision that "the owner shall be compensated to the full extent of his loss", La.Const. of 1974, Art. 1, Section 4, may the award to the defendant owners be sufficient to restore their business facilities to their condition prior to the taking, even though the amount so required is in excess of the market value of the parent tract from which a portion is taken for highway purposes?
We answer this question in the affirmative, for the reasons below to be stated.

I.
The state highway department expropriated certain property of the defendants in order to construct a new bridge and the highway approaches to it. The trial court awarded the defendants some seventy-two thousand dollars for the taking.[1] The defendants answered the appeal, requesting that the award be increased by some thirty-seven thousand dollars,[2] to allow for the replacement cost of a facility taken (without depreciation of such cost for prior use of the former facility).
Over the dissent of four judges, the five-judge majority of the court of appeal reduced the award by some twenty-four thousand dollars.[3] 359 So.2d 666 (La.App. 1st Cir. 1978).
The taking of the entire loading and parking area (.56 acre) essentially destroyed the marina business operations on the entire parent tract (1.56 acres). Even so, the intermediate court majority felt that the trial court's award for the taking of the loading area, $70,716, could not exceed the conceded market value of the land prior to the taking of the entire parent tract, $53,000.
There was no evidence establishing a greater value of the business conducted on the premises (such as by capitalizing income). In its absence, the court of appeal majority felt that the award to the landowners for the loss of their loading area must be limited to $47,000 (the $53,000 value of the entire parent tract prior to the taking, less the $6,000 value of the remainder of the taking).

II.
In so doing, the majority first correctly recognized the new measure of damages recognized by the 1974 constitution's provision that "the owner shall be compensated to the full extent of his loss." Article 1, Section 4. Citing constitutional documents and debates, as well as commentary subsequent to the adoption of the constitution, the majority concluded that the intent of the provision was to broaden former constitutional concepts of the measures of damages and was intended to permit the owner "`to remain in equivalent financial circumstances after the taking'". 359 So.2d 671.
We denied the highway department's application for review as to this part of the intermediate court's holding. 362 So.2d 575 (La.1978) (writ note 2). As the court of appeal stated, summarizing another decision interpreting the provision, the new constitutional language "has broadened the measure of damages in expropriation cases by requiring that an owner not only be paid the market value of property taken and severance damages to his remainder, but also that such an owner be put in as good a position pecuniarily as he would have been had his property not been taken." 359 So.2d 670.

*702 III.
Nevertheless, although enunciating that principle, the majority of the court of appeal concluded, 359 So.2d 672: "* * * Owner is entitled to recover for the loss of his marina operation in order to obtain compensation to the full extent of his loss. We find, however, that such loss cannot reasonably exceed the value of the marina [property as a whole], less the value of the remaining property. . . . We find that our award [so measured] will place Owner in the same pecuniary position he enjoyed prior to the taking. We also find that in this case, any award greater than that granted would constitute an economic waste. We deem it inappropriate to require payment of damages greater than the established value of a property utilized as a going business in the absence of proof of business losses."
The majority therefore disallowed the trial court's greater award. This had been based upon the replacement cost of constructing a new loading ramp, in order to permit the landowners to conduct the same business operations as they had prior to the taking.
The four-judge minority dissented from this reduction of the award. As stated by the dissenting opinion, 359 So.2d 673, 673:
"It was not the intention of the delegates in subordinating the rights of private ownership of property to the paramount right of the state to expropriate for the public good that the individual be forced to suffer financially. Stated another way, with the right of expropriation goes the responsibility and obligation to make the individual whole. . . . In the instant case, the landowner should receive the value for all land taken, excluding the improvements, and as compensation for the improvements he should receive the replacement or reconstruction cost thereof, without regard to depreciation, as of the date of the taking."
We granted the landowner's application for certiorari, 362 So.2d 575 (La.1978) (writ note 1), in order to decide whether (as contended) and to what extent replacement cost of the taken facility should be allowed, under the circumstances of this case, in order that, as constitutionally required, the landowners should be compensated "to the full extent" of their loss. La.Const. of 1974, Article 1, Section 4.

IV.
Under the evidence in the record before us (see V below), the landowners are entitled to recover the replacement costs of constructing a new loading and parking area for their marina business operations. The evidence so taken does not prove any other method by which the owners may be placed in as good a position pecuniarily as they enjoyed prior to the taking. Without the replacement of their loading area, their marina business operations will be substantially destroyed.
In view of the constitutional requirement that they be compensated to the full extent of their loss, it is not constitutionally significant that the award to them will exceed the market value of the property used in their business operations. The very purpose of the constitutional language was to compensate an owner for any loss he sustained by reason of the taking, not restricted (as under the former constitution, see Dakin and Klein, Eminent Domain in Louisiana (1970) 70-72, 78-79, 95-96, 154-262), to the market value of the property taken and the loss of market value of the remainder, sometimes including the cost to cure such damagei.e., where (formerly) the award was based solely upon the physical value of the property and the economic injury to the property itself, but not including injuries to a business or the cost of moving it due to the taking.
See, e. g.: Record of the Louisiana Constitutional Convention of 1973 (Louisiana Constitutional Records Commission, Baton Rouge, (1977): Volume 1, p. 86; Volume 6, pp. 1031, 1032, 1063-66 (39th Day's Proceedings); Volume 7, 1239-1243 (delegate explaining revision of finally-adopted section, retaining full-extent-of-loss language of previous drafts, see esp. 1241 noting that tenant might be awarded cost of moving *703 business, without regard to value of owner's property taken) (46th Day's Proceedings). See also: Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 15-16 (1974); Jenkins, The Declaration of Rights, 21 Loyola L.Rev. 9, 23-24 (1975).

V.
The evidence taken at the trial justifies the trial court's determination that, under the record, the cost of replacing the loading and parking area was the most appropriate method by which to compensate the landowners to the full extent of the economic loss the expropriation caused to their marina business operations. By the taking, the highway department expropriated the entire loading and parking area indispensable to the landowners' marina business activities conducted on the tract, part of which (i. e., the entire loading and parking area) was taken.
The parent tract was 1.56 acres in extent. It included a boat slip or channel, some 6-8 feet deep and about 1/4th acre in area, which had been constructed by the landowners some twenty years earlier. (The boat slip itself was not taken.)
On the south side of the boat slip, the landowners had filled in marshy land and had shelled it, and they had placed 110 linear feet of bulkheading on the boat channel (i. e., for boats to tie up to, and in order to prevent erosion of the compacted area). This compacted, shelled, and bulkheaded area was used for heavy-equipment and other loading and parking purposes in the defendant landowners' marina business operations, to be described below.
The highway expropriation took this entire (.56 acre) parking and loading area. The evidence indicates there is no other "dry" (compacted) land in the immediate vicinity available for such purposes.
On the north side of the bayou was about ¾th acre of "wet" (semi-marsh) land, presently used for boat sheds. Due to its marshy nature, it is not suitable for use as a loading and parking area.
The substantial issue of this appellate review is whether, to compensate the landowners for the loss of their entire loading and parking area, they should be awarded the cost of a replacement of a loading and parking area to be constructed in this remainder of the north side of the boat slip bulkheading it along its water front, filling and compacting it with more than 2,000 yards of landfill, shelling its surface with some 10,000 square feet of shell, etc.
Both the trial and the intermediate courts felt that the most reliable estimate of the cost for the replacement in this manner of the loading area was $62,216.
The evidence also shows that the "value" of the entire 1.56 acre parent tract was $53,000, based on the market value of $60,000 per acre for "dry" (compacted) land and $6,000 per acre for "wet" (semi-marsh) land in the area. These per-acre values were based on comparable sales of similar dry or wet land tracts in the area without improvements. The experts admitted there were no comparable sales of marina-facilities or marine-businesses by which to estimate value.
The .56 acre taken had a stipulated market value of $26,537 for its land area. This did not take into consideration the bulkheading (valued at $9,768), boat shed ($100), electrical conduit ($270), and additional pilings ($480) used to moor boats. However, the trial court felt that the award for merely these items to the defendant would not fully compensate them for the complete loss of access to the boat slip occasioned by the taking, indispensable to their marina business operations.
The defendants' boat slip and one-half acre loading area was situated adjacent to and immediately north of a bridge across Bayou Boeff. Due to a low railway bridge across the waterway to the east of this location, drilling rigs and other heavy equipment cannot be shipped by barge to serve oil operations in the interior swamp areas through which the waterways (including this bayou) run.
Consequently, the defendants' loading area is the only facility available to contractors *704 and suppliers from which barges can be loaded and supplies be shipped to the oil exploration and oil production activities in the swamp and reached by the waterways connected with Bayou Boeff west of the railway bridge.[4]
Prior to the taking, the loading area had been primarily used (a) for the commercial loading of heavy equipment and (b) for a boat launching business. The operations there conducted were an integral part of the defendants' entire business operations conducted at the site, which also included the rental of crewboats to oil companies and the sale of gasoline and supplies from the premises.
As noted, the barge slip and adjacent area was the only site available for the commercial loading of heavy equipment (such as drilling rigs and pipes) and oilfield supplies to the oil drilling and exploration activities in the swampland through which the Bayou waterways run.[5] Because of this unique availability, the defendant landowners had a competitive advantage in securing and servicing customers in the highly competitive business of crewboat rentals.
The boat-launch business conducted by the defendants on the site was likewise a valuable adjunct to their gasoline sales business conducted at the site.[6] As many as 75-80 customers used the boat-launch business on weekends.
This uncontradicted evidence shows that the loss through the taking of the loading area caused substantial pecuniary business damage to the defendant landowners. It virtually destroyed the commercial usefulness to them of their boat slip, and it was indispensable to them in their commercial loading and boat-launching activitiesand these economic activities, directly serviced by the loading and parking area which were expropriated, substantially contributed to the economic success of their other economic activities conducted at the site, primarily their crewboat rental and gasoline sales businesses.
It is thus apparent, as the trial court found, that for this loss the defendant landowners must be compensated by an amount additional to the surface value of the land and improvements taken in order that they "be compensated to the full extent of his [their] loss", as required by Article 1, Section 4, of our state constitution.
In the absence of other evidence in the record justifying a different award, we find no error in the trial court's determination that the replacement of their taken landing area, or the award to them of the cost to do so, is required to compensate them for this loss.

VI.
The plaintiff department suggests, however, that, although a loss may be indicated, no evidence proves an actual amount of pecuniary loss.[7] The department suggests that such business losses might most appropriately have been proved by income figures of the defendants' businesses, from which a capitalized value of their economic operations might be found and from which *705 capitalized value the percentage of (or entire) loss of their business income might be ascertained (or, rather, estimated).
This contention gave us some pause, as it did the majority of the court of appeal. Undoubtedly, evidence of this nature might have afforded a basis for determining a basis for a pecuniary award to the defendants for their business loss occasioned through the taking of the loading area, indispensable to their business activities.
Nevertheless, the landowners did in fact produce evidence of a different method by which to calculate an amount to fully compensate them for their loss, i. e., the replacement costs of a new loading area. This is an appropriate method of compensation, under the constitutional mandate, to repair fully the loss occasioned by their taking. (It is, perhaps, the most direct and sensible means of doing so, considering the unique value of the loading area to their commercial operations conducted at the site.)
We are unwilling to deny the landowners recovery, on some theory that their business losses may be compensated only by a capitalized-income approach to valuation. The constitution does not so require; but it does require that the landowners be fully compensated, without specifying any method by which to determine such compensation.
If the department felt that a capitalized-income approach would be a more adequate basis by which to estimate the landowners' loss, the department itself could have produced evidence to this effect. For instance, discovery and subpoenas of the defendants' business records could have supplied this information for the trier of fact.
Further, a capitalized-income approach, under the rather unique circumstances of the present case, may not have produced as certain a measure of the landowners' loss as did the replacement costs introduced in evidence in the present case. Even with full evidence as to the capitalized value of all of the defendants' business operations at the site, the estimate of the percentage to which the loading strip contributed to each would of necessity have been something of a speculative estimatefor instance, how many crewboat rentals would the defendants have lost, conducting their operations from another site, is not likely to have been a matter determined other than by informed guess.
We therefore do not accept the department's contention that the defendants' business losses could be proved only by an approach based on determining their incomes from the businesses conducted from the site.

VII.
Accordingly, we find no error in the trial court's determination that, under the present record, the defendant landowners should be compensated by the cost of replacing their loading area, to fully compensate them for the loss occasioned their business operations by the taking of the loading area indispensable to them.[8]
Rejecting higher estimates offered by the landowners, the trial court accepted a department expert's testimony that $62,216 would be the cost of replacing the loading strip by constructing a comparable one on the wet land owned by the defendants on the north side of the boat slipby land-fill, shelling, and bulkheading, etc.
This construction list did not include a permit fee of $1,200 required of federal authorities. Nor did it include an engineering fee, which another defendant's expert estimated at $1,500, see Tr. 125. The defendants are thus additionally entitled to an award of $2,700 for these indirect costs of constructing the new loading strip.
Thus, the total replacement construction cost proved by the record is $64,916. This figure was based on estimates of prices secured in 1975.
*706 In addition, the trial court awarded the defendants the value of their wet land on the north side of the boat slip, formerly used by them for other purposes. We see no reason why this is any less a loss to the defendants than if, instead of owning the site, they had been required to purchase it for purposes of the replacement loading area. For this element of damage, we find an award of $3,360 to be appropriate (.56 acres, at $6,000 per acre value of the set (semi-marsh) land).
A substantial issue is presented whether the landowners should be awarded the $62,216 construction costs in full, or should instead receive its value as depreciated by the 20-year use of the former (expropriated) loading area. The department's experts testified that a loading area has a normal 50-year life span, so that (if the 40% Depreciated value of the former loading area is to be taken into account) the landowners would receive only 60% of the direct construction costs of the new loading area.
The trial court felt that the landowners would receive an unjustified enrichment if they received a new loading strip with a 50-year life expectancy, in replacement of their expropriated former loading strip with its life expectancy merely of 30 more years. However, an enrichment is not "un justified", if justified by law (i. e., if there is a legal cause for it),[9] as would be the case if the constitutional provision so requires that a landowner must be fully compensated for his loss.
Under the circumstances and the nature of the property taken, we agree with the dissenting judges that no deduction should be made for the depreciated value of the former loading area which was expropriated. With regard to the landowners, the loading area had a lifetime usethe loading strip with a 30-year life expectancy had no less economic and actual value to them than would one with a 50-year life expectancy.
The evidence shows that the loading area was kept up and repaired as minor needs arose, with bulkheading replaced when damaged, for instance. More probably than not, despite its theoretical 30-year life expectancy, the expropriated loading strip at the end of thirty years would have still been as serviceable to them as on the date of taking.
The theoretical calculation of a 50-year life expectancy, for tax or accounting purposes, does not seem to us to provide an appropriate guide to compensating the present landowners for the cost of the replacement of their indefinitely serviceable loading area, with a new loading area no more serviceable to them, and which only theoretically will have a longer life than the one which was expropriated from them.
We have also taken into consideration the compensation-lag of protracted judicial proceedings and its effect on the sixty-two thousand dollar estimate for replacing the loading area, required in order to compensate the landowners fully for their loss occasioned by the taking. The estimate was based upon the 1975 costs, and this estimate must be considered conservative in the light of the inflationary rises in costs since 1975.
We do not, by these rulings, announce any general principle that replacement cost is always the most appropriate measure of awarding a landowner compensation for the taking of a physical asset used in his business, nor that the depreciation of the former asset should never be considered.
Generally, we assume, the landowners may be compensated fully by other approaches than by awarding them the replacement cost of the improvement taken, especially where (unlike the present instance) the property is not shown to be both unique in nature and location and also indispensable to the conduct of the landowners' business operations on the site from which a part is taken. Likewise, in the usual situation the depreciated value of the asset taken will have some lessening effect on the award to the landowner, since he *707 may be fully compensated by the actual pecuniary value of the asset taken. For instance, the full compensation constitutionally provided does not require that the owner receive a new building to replace a dilapidated one which is expropriated.
In the present case, however, the depreciation theories are of an essentially theoretical nature insofar as their effect upon the actual serviceability and economic value of the nature of the property (the loading strip) taken. Its replacement cost is appropriate, because of its unique and indispensable value to the defendants' business operations conducted at the site.
Therefore, under the evidence in the present record, we find the replacement cost of the asset taken is an appropriate measure of the damages by which to compensate fully the landowners for their holding area taken, and without any deduction for alleged depreciation occasioned by their prior use of the taken asset to be replaced.

VIII.
Accordingly, we find that the landowners should be awarded, for the costs of replacing the loading strip to compensate them fully for their loss, the following:

$64,916.00 direct and indirect costs of constructing
 replacement loading area
 3,360.00 value of their land upon which replacement
 loading area will be constructed
$68,276.00 Total

The award of this amount as the replacement cost (including land) of the former loading area, will fully compensate the landowners for that area's land value (parcel P-2-6), which was stipulated to be $26,537. The award of the replacement costs fully compensates the landowners for this stipulated value of the land (Parcel P-2-6) which was expropriated. To allow an additional recovery for the land taken would constitute a double recovery.

IX.
In summary, the landowner is entitled to the following award:

 $68,276.00 replacement costs, summarized in
 VIII
 370.00 improvements on loading strip (boat
 shed and electrical conduit) destroyed
 by taking Parcel P-2-6
 1,735.75 uncontested land value and severance
 damage of two non-contiguous strips
 taken (parcels P-2-7 and P-2-7-D-1)
 $70,642.75 Total for the takings
less 34,594.00 credit for deposits made by highway
 department
 $36,048.75 Net award to the defendant landowners
 for the taking

In addition, the previous courts properly awarded the landowners legal interest (7%) per annum on the amount from June 23, 1975, the date of taking (except for $790, not deposited until March 7, 1977, for which $90.10 interest was awarded), and attorneys' fees of 25% Of this amount (the difference between the amount taken and the amount awarded (see La.R.S. 48:453(E), as amended in 1976).

Decree
Accordingly, allowing credit for the deposits made, we amend the judgment of the previous courts so as to award the defendant landowners judgment for Thirty-Six Thousand Forty-Eight and 75/100 Dollars ($36,048.75), being the net amount due them, together with 25% Additional upon this amount as attorneys' fees. The defendants are additionally awarded the sum of $90.10 (interest on $790 not deposited until March 7, 1977) and also interest at the rate of seven per cent (7%) per annum on $35,258.75 (the principal amount, less $790) from June 23, 1975 until paid. The plaintiff is taxed with all costs of these proceedings. Except as herein amended, the judgment of the previous courts are affirmed.
AWARD TO LANDOWNERS IN EXPROPRIATION INCREASED; JUDGMENT OF COURT OF APPEAL AMENDED.
SUMMERS, C. J., dissents.
BLANCHE, J., recused.
NOTES
[*] Judge Pike Hall, Jr., Louisiana Court of Appeal, Second Circuit, is participating in this decision as an Associate Justice Ad Hoc.
[1] The trial court awarded a total of $72,451.75 for the entire taking, less credit for $34,594 deposited by the taker.
[2] The landowners prayed for an increase to $109,075 (less deposit).
[3] I. e., to $48,375 (less deposit).
[4] On the western (northern) side of the railroad bridge there are two other docks, each owned by oil corporations (Humble Oil and Amoco). However, they are not open to the use of independent companies and private suppliers.
[5] The equipment and supplies were transported in heavy trucks to the defendants' loading area, and then transhipped from there by barge to the drilling sites. Drilling rigs, for instance, had to be disassembled in order to be shipped by barge up to the drilling sites.
[6] Although not here relied upon, the boat-launch business also was of substantial contribution to a lounge business conducted by one of the defendant landowners on property immediately across the highway from the boat-launching area of the tract taken.
[7] The state also suggests that the evidence does not prove that the site across the present boat slip is the only one available for the continuance of the defendants' marina operations. We do not find this contention persuasive. The land values in the area (dry land at sixty to sixty-five thousand dollars per acre, wet land (which would have to be rebuilt as contemplated by our present award) at six thousand dollars per acre) do not suggest that the landowners could be compensated by the cost of moving their operation to (and acquiring) another location.
[8] This award should be, as the trial court found, in addition to the award to them for the value of the land actually taken and for the improvements thereon which were destroyed by the taking (but excluding the bulkheading, which will be replaced by the new construction).
[9] See, e. g., Tate, The Louisiana Action for Unjustified Enrichment, 50 Tul.L.Rev. 885, 886-88, 904 (1976).