CRAIN, J.
lain this expropriation proceeding, the property owners appeal a judgment that *313 denied and dismissed their claims seeking additional compensation. We affirm.
FACTS
The property at issue in this proceeding is located on Government Street in Baton Rouge and, prior to the expropriation, measured 0.618 acre (26,901.4 square feet) and contained a one story retail building. The relevant history of the property dates back to 1950, when Charles G. McDonald acquired it to open a tool rental and sales business, Baton Rouge Rental & Sales. The business operated as a sole proprietorship until it was incorporated in 1999. Shortly before his death that same year, McDonald transferred 49% of the corporation to a long time employee, Connie Hyde. After McDonald’s death, his daughters-, Charlene McDonald Nelson and Kathleen McDonald, inherited the property and McDonald’s 51% ownership in Baton Rouge Rentals & Sales. Hyde continued to operate the business, which paid rent to Charlene and Kathleen as the owners of the property.
In 2008, as part of a street improvement project, the City of Baton Rouge and Parish of East Baton Rouge (collectively “City”) expropriated a portion of the property pursuant to the “quick taking” procedure set forth in Louisiana Revised Statutes 48:441-60.[1] The expropriated property measured 0.101 acre (4,380.9 square feet) and included several feet of the front of the building. Baton Rouge Rentals & Sales vacated the building and ceased operations after accepting a | «¡relocation payment of $20,000.00 from the City.[2] The building was condemned, and, at the request of the owners, it was demolished and removed by the City.
In its expropriation petition, the City alleged that just compensation for the taking of the property was $143,205.00 and deposited that sum into the registry of the court. The City relied on an appraisal performed by Sharon D. Pruitt, a certified real estate appraiser who, after inspecting and analyzing the property, issued a report in 2008 stating that the parcel taken had a value of $48,504.00 and that the remaining property sustained damages of $94,701.00, resulting in total damages of $143,205.00. The property owners, Kathleen and Charlene, along with Charlene’s husband, Michael Nelson, filed an answer denying that the deposited sum was sufficient compensation and seeking additional compensation, attorney’s fees, expert fees, interest, and costs.
The claims proceeded to a bench trial. Michael Nelson testified that after McDonald’s death, Hyde operated Baton Rouge Rentals & Sales without any involvement by the property owners. The parties worked out an initial arrangement whereby Baton Rouge Rentals & Sales paid rent and made payments on a note owed to McDonald for funds he advanced to the corporation prior to his death. After the note was fully repaid, the parties agreed to an annual rent of $40,200.00, which Baton Rouge Rentals & Sales began paying in 2002 and continued paying until the property was expropriated in 2008. Michael testified that the only expenses for *314 the property were taxes and that Kathleen and Charlene netted about $38,000.00 per year from the lease.
Ralph Litolff, a certified public accountant who was accepted by the trial court as an expert in economic valuation, testified that he was retained by the property owners to do a “calculation engagement,” which he described as a calculation to determine the value of an income stream. Litolff used an annual net |4cash flow of $37,873.20, which he derived by deducting the average annual expenses of $2,326.80 from the annual rent of $40,200.00. He then applied a capitalization rate of 8.72%, the same rate used by Pruitt in her 2008 report, to conclude that the owners’ “pecuniary position” in the income stream was $434,325.69. According to Litolff, the owners were entitled to that amount because it “would produce approximately $37,900 net [in] perpetuity” each year. Litolff acknowledged that he did not consider the value of the remaining property because he was “looking at income, not dirt.” He also admitted that in performing a “calculation engagement,” there is an “agreement on the front end” of what will be used in the calculation; whereas in a more thorough “valuation engagement,” which he did not perform, he is able to use his professional judgment to determine the appropriate approaches and methods to the valuation. He conceded that a valuation engagement may have produced a different result.
Pruitt was accepted by the court as an expert appraiser and explained the process undertaken by her to determine just compensation. Her analysis began with a determination of the property’s value before the expropriation, referred to as the “before value,” based on its highest and best use as commercial property. To establish the property’s before value, Pruitt used three recognized appraisal techniques: (1) the sales comparison approach, which is based on the sale prices of similar commercial properties; (2) the income approach, which identifies and capitalizes potential future income generated by the property; and (3) the cost approach, an estimate of the reproduction costs of all improvements on the property, plus the land value. The cost approach produced a before value of $335,000.00, while the comparable sales approach yielded a value of $329,000.00. For the income approach, Pruitt used an annual market rent of $42,517.50 and deducted projected expenses of $11,033.00 to produce a net operating income of $28,083.00. Using a capitalization rate of 8.72%, Pruitt calculated a before value |fifor the property of $322,000.00 under this approach. After considering all three methods, Pruitt believed that the sales comparison approach was best for valuing the property and concluded that its before value, as improved, was $329,000.00.
Pruitt then determined the value of the “taken” property, which measured 4,380.9 square feet, was $48,504.00. She calculated that amount using unit prices of $8.25 per square foot for the vacant land (based on a sales comparison for vacant land) and $12.24 per square foot for the portion of the building included in the expropriated parcel (based upon the sales comparison for the improved property). She also included the value of other improvements, such as fencing and concrete, located on the expropriated property.
The remaining property that was not expropriated measured 22,520.5 square feet. To determine the damage to that property, Pruitt deducted the value of the expropriated parcel ($48,504.00) from the before value of the entire parcel ($329,-000.00) to arrive at a before value for the remaining property of $280,496.00. She then determined the value of that parcel *315 after the expropriation by multiplying the square footage of the remaining parcel (22,520.5 square feet) times the unit price for vacant land ($8.25 per square foot) and calculated an “after value” for the remaining parcel of $185,795.00. By comparing the before and after values of the remaining parcel, Pruitt concluded that the parcel decreased in value by $94,701.00 after the expropriation. The damages to the remaining parcel ($94,701.00) plus the value of the taken parcel ($48,504.00) resulted in total compensation of $143,205.00.
Pruitt also testified about a supplemental report she issued at the request of counsel in 2013 using rent and expense information provided by the property owners after the issuance of her original report. Based upon that information, Pruitt performed another valuation for the property using the income approach and arrived at a before value of $382,000.00. Using that figure, Pruitt calculated total | (¡compensation of $196,205.00, consisting of $51,451.00 for the expropriated parcel and $144,754.00 for damages to the remaining parcel.
This additional information did not change Pruitt’s opinion as to the appropriate amount of just compensation. She believed the rent and expense information provided by the property owners, was flawed because the lessor-lessee relationship was not the result of an arm’s length transaction: the lessors, Charlene and Kathleen, were also the majority shareholders of the lessee, Baton Rouge Rentals & Sales. It was not clear to Pruitt how much of the reported net compensation was a dividend produced by the corporation and how much was rent generated by the property. Pruitt also pointed out that there was no written lease; and, given the relationship between the parties, any lease was likely influenced by factors beyond real estate considerations. Consequently, she believed the market-based figures in her original report were more appropriate for valuing the property under the income approach. Pruitt maintained that the appropriate figure for just compensation was $143,205.00, the amount determined in her first report using a before value for the property of $329,000.00 produced by the sales comparison approach. Notably, Li-tolff, the CPA retained by the landowners, testified that he had no opinion concerning Pruitt’s valuation of the property because “that’s her expertise,” adding, “I have no reason to doubt what her conclusions were.”
At the conclusion of the trial, the trial court adopted the just compensation figure .calculated by Pruitt in her first report, reasoning:
Ms. Pruitt unequivocally testified that she felt the initial estimate of 2008 was the best value of the property taken, and she ... was most comfortable that it represented just compensation. She felt that the 2013 report relied on what she termed as flawed information. We’ve got an oral lease that she was of the opinion — and I think & good argument can be made — the lease terms were not at arm’s length; that there was no actual term of the lease. I mean, based on an oral lease, technically, the lessee can walk out tomorrow, and he’s not — he’s not in there for a set term. The building was old, [it has] depreciation, maintenance and other issues that are not. addressed [by the lease] that in the real world are addressed.
|7And in essence, her opinion was that she felt these numbers, in essence, confused the business relationship with the rental rate. And I can’t say, having listened to the testimony and reviewed the evidence that’s submitted, that I disagree with that. I ... find it kind of hard to know what the true nature of *316 that transaction between Mr. McDonald ... and Mr. Hyde were other than he was apparently given 49 percent of this business and was making payments on an annual basis.
When I look at [the reports], I’m of the opinion that Ms. Pruitt’s February 2008 [report] accurately reflects ... the actual valuation of the property taken. And I think the figures suggested by her initially reflect what I would consider to be the best measure of compensation based on the actual extent of the loss incurred as a result of the expropriation.
So for that reason, the Court is of the opinion that the sum tendered, $143,205, ... is just and adequate compensation based on the actual extent of the loss suffered by the property owners, and I’m going to render judgment for that amount.
In accordance with those reasons, the trial court signed a judgment on October 80, 2013, confirming just compensation to the property owners in the amount of $143,205.00 and dismissing all claims for additional compensation, expenses, and court costs. The property owners appealed and contend that the trial court erred by awarding only $143,205.00 instead of the “pecuniary value” of the capitalized rental income, less certain credits.
DISCUSSION
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. La. Const, art. I, § 4(B)(1). In every expropriation or action to take property pursuant to Louisiana Constitution Article I, Section 4, the owner shall be compensated to the fall extent of his loss. See La. Const, art. I, § 4(B)(5); La. R.S. 48:453C. Except as otherwise provided in the Constitution, the full extent of loss shall include, but not be limited to, the appraised value of the property and all costs of relocation, inconvenience, and any |8other damages actually incurred by the owner because of the expropriation. See La. Const, art. I, § 4(B)(5).
The measure of damages, if any, to the defendant’s remaining property is determined on a basis of immediately before and immediately after the taking, taking into consideration the effects of the completion of the project in the manner proposed or planned. La. R.S. 48:453B. Damages to the remaining property are sometimes characterized as “severance damages,” a term which describes the compensable damages that flow from the partial expropriation of a tract of land, ie., the difference between the value of the remaining property before and after the taking. See State, Department of Transportation and Development v. Restructure Partners, L.L.C., 07-1745 (La.App. 1 Cir. 3/26/08), 985 So.2d 212, 221, writ denied, 08-1269 (La.9/19/08), 992 So.2d 937.
Thus, a landowner whose property is expropriated is to be compensated so that he remains in an equivalent financial position to that which he enjoyed before the taking. See Restructure Partners, 985 So.2d at 220. The burden of proof on the property owner in an expropriation case is to establish his claims by a reasonable preponderance of the evidence; speculation, conjecture, mere possibility, and even unsupported probability are not sufficient to support a judgment. Restructure Partners, 985 So.2d at 220. A factfinder’s factual determinations as to the value of property and entitlement to other types of damages are subject to the manifest error standard of review, while the amount of damages awarded is subject to the abuse of discretion standard of review. Restruc *317 ture Partners, 985 So.2d at 221. The trial court is not required to accept or reject the testimony of any particular witness, but may give whatever weight it considers appropriate to the testimony of any and all witnesses in making its factual determination of the value of the property taken. The court may reach ^[¿¡conclusion that does not coincide with the testimony of any witness. . Restructure Partners, 985 So.2d at 221.
The property owners contend that the trial court erred in failing to award the “capitalized value ... [of] the stream of income” derived from the rental of the property. The appellants argue that the trial court failed to appreciate that they had “two pecuniary positions in this ease ... [firstly, the fair market value of the real estate and, secondly, the greater value-to-owner of the income produced by the real estate.” According to the property owners, the trial court erred by awarding only the market value of the property taken and erroneously denied their claim for economic loss.
The trial court considered evidence from both parties concerning the full extent of the property owners’ loss. That evidence included the expert testimony and report of an appraiser, Pruitt, who utilized three generally accepted appraisal techniques: replacement cost, income, and sales comparison (sometimes called the “market approach”). These three approaches were recognized and explained by the supreme court in Exxon Pipeline Co. v. Hill, 00-2535 (La.5/15/01), 788 So.2d 1154, 1162, as follows:
There are three generally accepted appraisal techniques: (1) the market approach; (2) the cost approach; and (8) the income approach.... Under the market approach, the appraiser considers the market value estimate which is predicated upon prices paid in actual market transactions and current listings, i.e. comparable sales. The cost approach method requires the appraiser to derive the value the property by estimating the replacement or reproduction cost of the improvements; deducting therefrom the estimated depreciation; and then adding the market value of the land, if any. Finally, in utilizing the income approach, the appraiser uses an appraisal technique in which the anticipated net income is processed to indicate the capital amount of the investment which produces the net income.
In utilizing these three approaches, Pruitt considered the property’s propensity for generating rental income. Using market data for rent and expenses, she arrived at a value for the property under the income approach that was slightly Imless than the value she determined based upon the sales comparison approach, which she believed was the most appropriate method for valuing the property. The property owners subsequently provided Pruitt with additional revenue and expense information that indicated a slightly lower gross rent for the property and significantly less expenses, which resulted in a higher “net” rent. Although those figures produced a higher value for the property under the income approach, Pruitt remained confident that the sales comparison approach in her original report was the most accurate measure of the property’s value. Pruitt believed that the receipts and expenses identified by the owners were affected by the party’s business operations in Baton Rouge Rentals & Sales, which was not a party to the proceeding. Pruitt reasonably questioned whether the unusually high net rent was, at least in part, a dividend produced by .the corporation’s business operations rather than rent generated by the property. The trial court shared that concern in its oral reasons.
*318 Contrary to the property owners’ assertion, the trial court did not refuse to make an award for economic losses; the court simply adopted one method of valuing the property, the sales comparison approach, over another method, the income approach. The record contains a reasonable basis for the trial court’s decision. The trial court was not required to use the income approach to value the property simply because it was income producing. See State Through Department of Highways v. Constant, 369 So.2d 699, 705 (La.1979); City of Baton Rouge v. Jay’s Donuts, Inc., 13-1722 (La.App. 1 Cir. 12/17/14), 2014 WL 7187119, p. 7. Addressing a similar argument in Jay’s Donuts, this court explained:
In remanding this matter, this Court instructed the trial court to determine just compensation based on the full extent of Jay’s Donuts’ loss, which included the loss of business income based on the businesses cash flows. It should be noted that the Louisiana Supreme Court expressly rejected the contention that a trial court is obligated to fix damages in an expropriation proceeding using the appellant’s proffered valuation formula. Jay’s Donuts uses Constant in support of | nthe legal proposition that income figures of a defendant’s business afford an appropriate basis for a pecuniary award for a business’s loss occasioned through the taking of immovable property indispensable to the defendant’s business activities. While it is true that Constant does indicate that the appellant’s proffered valuation formula might afford an appropriate basis for fixing an award to the owner of an expropriated business, a trial court is not required to fix its compensation award based upon such a formula. See Constant, 369 So.2d at 704-705.
The Louisiana Supreme Court stated in Constant, “We are unwilling to deny the landowners recovery, on some theory that their business losses may be compensated only by a capitalized-income approach to valuation. The constitution does not so require; but it does require that the landowners be fully compensated, without specifying any method by which to determine such compensation.” Id. at 705. There, the supreme court reasoned that the landowners had “produce[d] evidence of a [djifferent method by which to calculate an amount to fully compensate them from their loss, ie., the replacement costs of a new loading area,” concluding that this was “an appropriate method of compensation under the constitutional mandate to repair fully the loss occasioned by [the] taking,” Id.
In the instant case, the City/Parish presented evidence by which to calculate an amount to fully compensate the business for the expropriation of its property; therefore, it cannot be said that the trial court’s decision to credit the City/Parish’s proffered valuation formula was manifestly erroneous.
Jay’s Donuts, 2014 WL 7187119 at p. 7.
Likewise, in the present case, the City presented evidence by which to calculate an amount to fully compensate the property owners for the expropriation of their property. Based upon our review of the record, the trial court did not abuse its discretion or commit manifest error by relying on that evidence to determine the just compensation due to the property owners. The appellants’ assignments of error have no merit.
CONCLUSION
The October 30, 2013 judgment is affirmed, and all costs of this appeal are assessed to Charlene McDonald Nelson, *319 Michael H. Nelson, and Kathleen McDonald.
AFFIRMED.

. Although Louisiana Revised Statute 48:441 expressly provides a "quick taking” mechanism for expropriation by the Department of Transportation and Development, a political subdivision is also entitled to utilize the procedure pursuant to Louisiana Revised Statutes 33:1321-37. See City of Baton Rouge v. Johnca Properties, L.L.C., 00-2524 (La.6/1/01), 794 So.2d 766, 772-73; City of Baton Rouge v. F & K Investments, LLC, 13-0501 (La.App. 1 Cir. 11/1/13), 135 So.3d 760, 763.

. Baton Rouge Rentals & Sales did not pursue a claim for loss of business and is not a party to this proceeding.