604 So.2d 62 (1992)
Gerald C. NAQUIN, Mark J. Naquin, and Naquin Bros., Inc.
v.
DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT OF the STATE OF LOUISIANA, Community of the Sisters of the Immaculate Conception, Iris Richard Falgout and Glynn Richard Heroman.
No. CA 91 0629.
Court of Appeal of Louisiana, First Circuit.
June 2, 1992.
Rehearing Denied August 10, 1992.
Writ Denied November 13, 1992.
*63 Jess Waguespack, Napoleonville, for plaintiff.
Thomas Rayer, New Orleans, for Sisters of Immac. Conceptiondefendant.
David Richard, Thibodaux, for Iris R. Falgout and Glynn R. Heroman-defendant.
Robert Ledoux, Baton Rouge, for State of La. (DOTD) defendant.
Before SHORTESS, LANIER and CRAIN, JJ.
CRAIN, Judge.
Louisiana Department of Transportation and Development (DOTD) appeals a judgment of the district court which awarded damages, attorney's fees, and costs to the plaintiffs, sugar cane producers, Gerald Naquin, Mark Naquin, and Naquin Bros., Inc., for losses they sustained as a result of an inverse condemnation. Finding merit with one of the defendant's five assignments of error attacking the award of future gross profits and attorney's fees, we amend the judgment of the district court, and as amended, it is affirmed.
The facts, which give rise to this claim for damages, are undisputed.
In conjunction with their sugar cane farming production, the plaintiffs entered two separate leases for the rental of a certain tract of land in Labadieville, Louisiana. One lease was granted from Mrs. Iris Falgout and Mrs. Glynn Heroman, who were co-owners of a portion of the tract of land. These recorded leases had terms from January 1, 1982 to December 31, 1995. A contiguous portion of land was leased by the plaintiffs from the Congregation of the Sisters of the Immaculate Conception. The recorded leases which reflected that transaction had terms from March 1, 1982 to February 28, 1993.
On October 18, 1984, and December 6, 1984, the State of Louisiana and the Department of Transportation and Development purchased a 26.42 acre tract in the leased area from the respective owners of the land. The sellers were compensated for their interest in the land and any interest in the 1985 sugar cane crop then growing on the land. The purpose of the acquisition by the DOTD was to build a right of way which was intended to straighten a sharp curve in the roadway where Louisiana Highway 39 met Louisiana Highway 1.
On June 19, 1987, the plaintiffs brought this action against DOTD[1] to recover damages for loss of their crops, leasehold rights, the expense of alterations, increased operating expenses and loss of future gross income resulting from the sale of the 26.42 acre tract.
On December 31, 1990, the district court awarded judgment in favor of plaintiffs against the defendant, DOTD, in the amount of one hundred sixteen thousand four hundred forty two dollars and eightyseven cents ($116,442.87), attorney's fees of one-third of the judgment amount, plus expert fees and costs. The trial judge gave written reasons for judgment, which read, in pertinent part:
The fact of plaintiffs' leasehold interest was well established. The remaining issue to be decided by the court is compensation due plaintiffs and matters incidental thereto.

*64 Plaintiffs' expert, Dr. Kenneth Wegenhoft, qualified in the field of agricultural economics, submitted a report (Plaintiffs' Exhibit 7.11) and testified that plaintiffs' total damages were estimated to be $116,442.87. This included loss of gross profits (as distinguished from net profits) from fiscal years ended March 31, 1986 through 2010 (crop years 1985 through 2009) and increased cost of operations as a result of the taking. Profits for the years 1991 through 2010 were estimated and discounted to give effect to the time value of money and the risks involved in realizing those profits. Gross profits for the years 1986 through 1990 were based upon actual performance data as evidenced by the exhibits introduced by plaintiffs' (Plaintiffs' Exhibits 7.12 to 7.17) and the testimony of plaintiffs' certified public accountant, David M. LeBlanc. Based upon the testimony of plaintiffs' and corroborated by FALGOUTHEROMAN and SISTERS, plaintiffs could expect their leasehold interest to continue until the oldest of the Naquin brothers reached retirement age in 2010. Furthermore, there was no evidence that FALGOUTHEROMAN and SISTERS would put their land to any use other than in the production of sugar cane, or that they would even contemplate leasing their land for sugar cultivation to tenants other then (sic) the plaintiffs.
DOTD's expert, Mr. Donald F. Sagrera, qualified in the field of agronomy, submitted a report (State Exhibit # 5) and testified that plaintiffs' total damages were estimated to be $46,098.63. Mr. Sagrera essentially adopted the data supplied by plaintiffs (and the same data used by Dr. Wegenhoft) in the preparation of his report. However, he did not include hoisting and hauling allowances as part of revenues lost. The court considers the failure to consider hauling and hoisting allowances as lost revenues as being in error. These sums are just like the crop receipts that would have been received had the leasehold interest not been taken. Also, for the years 1988 through 2010 his estimate of losses were based on net profits rather than gross profits (State Exhibits 3 and 4). The court finds this approach to be inconsistent. he also reduced the acreage of cane for the crop year 1988 without justification.
The court attaches great weight to the fact that Mr. Sagrera has qualified as an expert in the field of agronomy (State Exhibit # 2) whereas Dr. Wegenhoft qualified in the field of agricultural economics (Plaintiffs' Exhibit 7.11). Based upon the testimony of both, Dr. Wegenhoft is found to be more appropriately qualified to evaluate plaintiffs' loss than is Mr. Sagrera. Furthermore, the court finds that Dr. Wegenhoft's approach to the evaluation of the loss, that is, subtracting variable costs from revenues to determine gross profits, more accurately and consistently measures the extent of loss suffered by the plaintiffs.
The plaintiffs prayed for attorneys fees and in support thereof introduced the contract for legal services between (sic) plaintiffs and their counsel (Plaintiffs' Exhibit 7.21). Considering the provisions of the contract not being out of line with the complexity or work involved in presentation of the case, the court considers the award of attorneys fees in accordance with the contract thoroughly justified.
Considering the above, judgment should be prepared and presented accordingly.
Louisiana Constitution, Article I, Section 4 provides for protection of personal property rights in the event of expropriation or damage:
Art. I. Sec. 4. Right to Property
Section 4. Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private *65 entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss ... (Emphasis Added)
* * * * * *
The Louisiana Supreme Court, in a discussion of the predecessor provision to this constitutional article[2] explained the type of state action contemplated by the Article and the type of property right considered. Columbia Gulf Transmission Company v. Hoyt, 252 La. 921, 215 So.2d 114 (1968). In Columbia, id. 215 So.2d at 120, the Court stated:
The foregoing provision applies to "the intentional or purposeful expropriation or appropriation of private property for a public use or convenience." See Angelle v. State, 212 La. 1069, 34 So.2d 321, 2 A.L.R.2d 666. Under this provision, property is "taken" when the public authority acquires the right of ownership or one of its recognized dismemberments. See Parish of Jefferson v. Texas Co., 192 La. 934, 189 So. 580; 2 Nichols, Eminent Domain, Sec. 6.1[1] (3d ed. rev. 1963); 24 La.Law Rev. 849, 850-851. Property is considered "damaged" when the action of the public authority results in the diminution of the value of the property. Parish of Lafayette, etc. v. Hernandez, 232 La. 1, 93 So.2d 672; Texas Pipe Line Company v. Barbe, 229 La. 191, 85 So.2d 260; 4 Nichols, Eminent Domain, Sec. 14.2 (ed. rev. 1963).
* * * * * *
The constitutional designation private property is restricted to no particular type of private property. It is sufficiently broad, in our opinion, to include leases, though lease rights may be classified as personal in the structuring of our codal system.
* * * * * *
Lease rights, however, may be damaged other than by termination of the lease. If the land taking is partial only, such as in the acquisition of a servitude for a right of way, the taking may damage lease rights, though it does not render the land unusable for lease purposes or terminate the lease. See, generally, Comment, 24 La.Law Rev. 849, 873-875. These damages are also compensable to the lessee.
See also: Reymond v. State, DOH, 255 La. 425, 231 So.2d 375 (1970).
In this case there is little dispute that the plaintiffs' leasehold rights were damaged by the State's inverse condemnation of a portion of the land upon which those rights rested, and the trial court correctly so found. The dispute, however, in the present case, centers around the extent of damages occasioned by that acquisition.
In four assignments of error, the defendant assails the nature and extent of the court's award of loss of future gross profits.
In the event of a public taking, the Louisiana Constitution attempts to compensate the damaged party "to the full extent of his loss." La. Const. Art. I, Sec. 4. Such "full compensation" has been held in include cost of relocation, inconvenience and loss of profits. State, DOTD v. Dietrich, 555 So.2d 1355 (La.1990). Additionally, loss of business and replacement costs have also been recognized as compensable items of damages in these cases. (Business Losses)State, DOTD v. Sheridan, 517 So.2d 415 (La.App., 1st Cir., 1987); (Replacement Costs)State, DOH v. Constant, 369 So.2d 699 (La.1979).
The determination of what amount will compensate an individual "to the full extent of his loss" must be made on the basis of the facts of each case and in *66 accord with the uniqueness of the property right taken. State, DOTD v. Sheridan, supra. Such findings by the trial court will not be disturbed in the absence of manifest error. State, DOTD v. Sheridan, supra. Accordingly, when an expert's well reasoned testimony supports an award of damages and is accepted by the trier of fact, the property owner should prevail. State, DOTD v. Dietrich, supra.
In their first assignment of error the State, DOTD contends that the district court's award of loss of future gross profits is clearly wrong because it failed to consider the four year growth cycle of sugar cane.
It is apparent from a review of the testimony of the plaintiff, Gerald Naquin, and that of Dr. Kenneth Wegenhoft, the expert in agricultural economics, that the growth cycle of sugar cane played a significant role in their analysis of loss of future gross profits.
Gerald Naquin was aware of the growth cycle of sugar cane and its role in production. He first mentioned it when explaining his brother's absence at trial. Mr. Naquin stated that his brother was overseeing the cane planting, which "... has to produce for us for three years."
The growth cycle was also used to explain the amount of acreage available for planting from year to year. Gerald Naquin explained that a certain number of acres was set aside each year as fallow land and the remainder was planted land. According to the plaintiff, this bore a direct correlation to the plaintiffs' annual income as reflected by his adjusted annual income statements.
Moreover, the testimony of Gerald Naquin indicates that the growth cycle was involved in his lease arrangement, in that the lease indicates that the stubble and plant cane are owned by the plaintiffs and the lease price was based upon the acres in rotation.
Finally, Mr. Naquin drew a distinction between the land which was in cane as opposed to that which was in stubble when discussing the tract of land taken by the defendant. He stated that some of the land was in stubble and he was allowed to cut the rest, which was in cane, in order to use it for seed.
The testimony of Dr. Kenneth Wegenhoft also illustrates a cognizance of the growth cycle of sugar cane.
In giving his professional opinion concerning the loss sustained by the plaintiffs, Dr. Wegenhoft testified that he had inspected the premises (and thus, was aware of its condition) prior to the preparation of his report. He stated that his report was based upon actual production figures supplied to him by the plaintiffs for the years 1986 through 1990. These figures formed the basis of his projection into the year 2010. The raw data consisted of the amount of acreage, the number of acres taken, the amount of cane, the production yields, cost estimates, mill share information, rent information and the amount of molasses bonuses.[3]
In his discussion of income, as well as his discussion of expenses, Dr. Wegenhoft evidenced an awareness of the sugar cane growth cycle.
In discussing total yearly income, Dr. Wegenhoft stated that he computed this amount by multiplying the income per acre by the number of income acres. In this regard, although 26.42 acres were taken by the defendant, Dr. Wegenhoft utilized 18.82 acres as the figure representing the number of income acres, because "18.82 acres reflects those acres of cane that produce sugar...."
Dr. Wegenhoft thereafter figured the estimated net income loss by subtracting the total yearly expenses from the total yearly income. In discussing the topic of expenses, Dr. Wegenhoft specifically explained that "not all land that is in the sugar farm has cane on it. You have fallow land, and this can vary from year to year, depending upon the rotation, depending upon the size of the blocks in any particular acreage and the various acres of the cane that's there. What can be plowed *67 out, what looks good, what looks bad, this can vary from year to year."
In view of this testimony in the record, there is no indication that the trial court did not consider the growth cycle of sugar cane in arriving at its assessment for future gross profits. For this reason we find that the defendant's first assignment of error lacks merit.
In his second assignment of error the defendant contends that the trial court erred in awarding loss of future profits beyond the 1985 crop, since the plaintiffs had already mitigated their losses by replacing the lost acreage with additional leased farmland.
We recognize the fact that, in cases such as this, the one sustaining the loss is obliged to minimize his damages as much as possible. See: Humble Pipe Line Company v. Wm. T. Burton Industries, Inc., 221 So.2d 526 (La.App., 1st Cir., 1969).
The record reveals the fact that plaintiffs acquired additional land after 1985. Gerald Naquin testified that, in 1986, additional acreage was farmed in that they utilized 364 acres formerly used for cattle grazing; a former crawfish farm area was activated as farm land; and some low land in the back portion of the subject tract was acquired. Additionally, from 1987 to 1988 more land was acquired from Dugas & LeBlanc, for farming.
The intent of the parties, in making the acquisition after the State's inverse condemnation, is unclear from the record. However, the testimony of Dr. Wegenhoft presents a plausible explanation. When questioned on the subject, Dr. Wegenhoft responded as follows:
Q. In your opinion, if on the day that the Highway Department came in and took the 26.42 acres, as they did, and the Naquins were able to move right down the road and secure another 26.42 acres, would they have suffered a loss?
A. They would have. It doesn't make any difference if they could have picked up additional acreage. This tract was gone from their control. Had it not been gone, they would have had it plus the additional 26.42 acres. The fact that in this instance there may or may not have been other land available, I think it's [ir]relevant to the case.
It is apparent from the reasons for judgment that the trial judge placed great emphasis on the expert testimony of Dr. Wegenhoft. As such, the court concluded the plaintiffs sustained a compensable loss and it rejected the defendant's theory that the future acquisition of an equal amount of land abolished the loss. Under these circumstances we cannot say that this finding is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La., 1978); State, DOTD v. Dietrich, supra.
In the third assignment of error defendant alleges that the trial court's award of future gross income was clearly wrong in that it improperly based the award on the work life expectancy of the plaintiff, Gerald Naquin.
With respect to the historic background of this business, Gerald Naquin testified that his father had farmed this tract of land before him for as far back as 1930. He stated that the current leases held by the plaintiffs date back to 1979 with Falgout-Heroman and 1982 with the Congregation of Sisters. According to the plaintiff, he is in good health and has no limitations on his work abilities as a farmer. He also stated that he is satisfied with the lease agreement and would be on the land for 20 years.
The lessors of the land testified concerning their lease arrangements with the plaintiffs.
Glynn Heroman stated that she was satisfied with the plaintiffs' tenancy and, if the circumstances continued, he would continue to lease to the plaintiffs.
Lessor, Sister Delores Bourg, a representative of the Congregation of Sisters of the Immaculate Conception, testified that her Order would be willing to renew its lease with the plaintiffs if their performance remained satisfactory. She did state, however, that if given the right price, she would consider selling the land.
*68 Dr. Wegenhoft stated that he utilized the work life of the principals to project the loss profits because, in this case, the corporation is the principals. Based upon the information presented, Dr. Wegenhoft postulated that since plaintiff, Gerald Naquin, had a work life expectancy of 20 more years (i.e., age 65 years) the loss profits for this business could reasonably be projected to the year 2010.
The trial judge concluded that "plaintiffs could expect their leasehold interest to continue until the oldest of the Naquin brothers reached retirement age in 2010" and that "there was no evidence that FALGOUT-HEROMAN and SISTERS would put their land to any use other than in the production of sugar cane, or that they would even contemplate leasing their land for sugar cultivation to tenants other than the plaintiffs."
Our review of the leases, which form a part of the record, indicate that, following the time of the defendant's taking in 1986, there existed a lease on the tract of land owned by the Congregation of Sisters until 1993 and a lease on the tract of land owned by Falgout and Heroman until 1995.
The finite term of these leases, coupled with the testimony of Sister Bourg, to the effect that her Congregation would consider selling the land if the right price was offered, convinces us that an award of future gross income based upon a term beyond the term of the stated leases is speculative. See: State, DOTD v. Dietrich, id.; State, DOTD v. Exxon Corp., 430 So.2d 1191 (La.App., 1st Cir., 1983), writs den. 437 So.2d 1155, 1156 (La., 1983). Under these circumstances the trial court's award of $116,442.89 predicated upon the 20 year work life expectancy of Gerald Naquin was erroneous. We, therefore, reduce the award of damages to reflect loss of future gross income on the Congregation's property for a period of 8 years and on the Falgout-Heroman property for a period of 10 years. Accordingly, we amend the trial court judgment to award plaintiffs the sum of $55,798.16.
In the final assignment of error attacking the award of future gross profits defendant alleges that the award is excessive. Defendant reasons that by deducting only variable costs, and not fixed costs, from each acre farmed that the resultant figures which form the basis of the award are inflated. We disagree.
The trial judge found that Donald Sagrera's approach to projected losses by the use of net profits rather than gross profits was unacceptable. He also found that Dr. Wegenhoft's approach of subtracting variable costs from revenues to determine gross profits "more accurately and consistently measures the extent of loss suffered by the plaintiffs."
This finding is fully supported by the record.
The difference between "fixed" and "variable" cost was explained by David LeBlanc, the plaintiffs' certified public accountant. Mr. LeBlanc testified that "fixed" costs are those which remain constant, while "variable" costs change in accord with the production involved.
Dr. Kenneth Wegenhoft, (the expert economist whom the court found "to be more appropriately qualified to evaluate plaintiffs' loss ...") explained his computation of those losses at the time of trial. Dr. Wegenhoft testified that he subtracted total yearly expenses from total yearly income in arriving at his figures for plaintiffs' estimated net income loss. According to Dr. Wegenhoft, the variable costs per acre were supplied by plaintiff and his accountant and were based upon actual performance data. Dr. Wegenhoft when questioned as to an explanation of why he did not use fixed costs in his calculation explained that he did not do so because he was preparing a partial budget.
These findings, which involve an evaluation of credibility, are fully supported by the record. Under these circumstances we find no manifest error. Arceneaux v. Domingue, supra.
In their final assignment of error the defendant alleges that the award of attorney fees is vague, unreasonable and excessive. In this case there was no expropriation suit filed. The State purchased *69 the property from the landowner and simply ignored the recorded leases of the lessees. Where property is "taken" or "damaged" without an expropriation proceeding there is an inverse condemnation. State through DOTD v. Chambers Investment Co., Inc., 595 So.2d 598 at 602-603 (La. 1992); Harrington v. Southwestern Electric Power Co., 567 So.2d 731 (La.App.2d Cir.1990). The standard for an award of attorney fees in those cases is set forth in Title 13, Section 5111 of the Louisiana Revised Statutes, and reads, in pertinent part:
R.S. 13 Sec. 5111. Appropriation of property by state, parish, municipality or agencies thereof; attorney, engineering and appraisal fees; prescription
A. A court of Louisiana rendering a judgment for the plaintiff, in a proceeding brought against the State of Louisiana, a parish, or municipality or other political subdivision or an agency of any of them, for compensation for the taking of property by the defendant, other than through an expropriation proceeding, shall determine and award to the plaintiff, as a part of the costs of court, such sum as will, in the opinion of the court, compensate for reasonable attorney fees actually incurred because of such proceeding. Any settlement of such claim, not reduced to judgment, shall include such reasonable attorney, engineering, and appraisal fees as are actually incurred because of such proceeding.... (Emphasis Added).
In Pillow v. Board of Commissioners, the Court found that a one-third percentage based on a contingent fee contract was reasonable because the case involved complex issues, meticulous preparation, extensive work and extensive hours. 425 So.2d 1267 (La.App.2d Cir., 1982), writ granted, 427 So.2d 1200 (La., 1983), writ recalled, 445 So.2d 1225 (La., 1984).
While it is true that a court is required to allow the introduction of "all admissible evidence" when an attorney fee is claimed (La.R.S. 13:3738), nevertheless, proof of the value of an attorney's services is not necessary where the services are evident from the record and/or are rendered under the supervision of the court. A trial judge has much discretion in fixing an attorney fee, and his award will not be modified on appeal absent a showing of an abuse of discretion. Gulf Wide Towing, Inv. v. F.E. Wright (U.K.) Limited, 554 So.2d 1347 (La.App. 1st Cir.1989).
The record reflects that the plaintiffs' requested attorney fees was based on a contingent fee contract executed by the plaintiffs and their attorney. This contract was introduced by plaintiffs as the basis for their request for attorney fees. The contract provides that after suit is filed, plaintiffs become obligated for a fee of onethird of any award involved.
In its judgment, the court awarded "attorneys fees in an amount equal to onethird (1/3) of the $116,442.87[4] plus interest..." The Reasons for Judgment contain an explanation of the award of attorney's fees. The court found such an award to be reasonable in that "the provisions of the contract [were] not ... out of line with the complexity or work involved in presentation of the case ..."
It appears, from this explanation, that in making the award, the court took into account the complexity of the case and the work involved in the presentation. The trial judge heard the case. He was aware of its complexity and experienced, first hand, the work and preparedness of counsel. The reasons justifying this award, although not as comprehensive as those set forth in Pillow, id., are, nonetheless sufficient to sustain this award. Additionally, plaintiffs based their request for attorney fees on the 1/3 contract and we cannot award a greater amount. Based on the facts of this case we find no abuse of discretion by the trial court in its award of attorney's fees.
For the reasons assigned, the judgment of the trial court is amended and as amended, *70 affirmed at defendant's costs, which are $272.00.
AMENDED AND AFFIRMED.
SHORTESS, J., concurs in part and dissents in part with reasons.
SHORTESS, Judge, concurring in part and dissenting in part.
I agree with the majority's finding that the trial court erred in basing its award of damages on Gerald Naquin's work life expectancy. I disagree, however, that the award should have been based solely on the remaining years of the Congregation's lease, i.e., eight years, and the Falgout-Heroman lease. i.e., ten years. The uncontested facts show that the Naquins have farmed the properties since 1930 and had renewed leases with the respective property owners without problems throughout the years. In my opinion, the trial court was not clearly wrong in awarding damages beyond the expiration of the current leases.
I also agree with the majority's reduction of the attorney fee award. LSA-R.S. 13:5111(A) permits the award of "reasonable attorney fees actually incurred." The parties agreed the contingency fee contract provided for a fee of one-third of the amount awarded. The majority has reduced the award to $55,7798.16, and I agree that one-third of that amount is $18,599.38. However, since I would have awarded more in damages, the fee "actually incurred" would have been more.
I respectfully concur in part and dissent in part.

Appendix A

Revised Estimate of Damages to

Naquin Bros., Inc.
This report updates the Estimate of Damages to Naquin Bros., Inc. made on 9 April, 1988 and the Revised Estimate of Damages made on 15 February, 1990.
The revised estimated damages are as follows:

Estimated Net Income Lost
1986-90 $40,637.00
Discounted Present Value
1991-2010 66,647.40
Estimated Increased Cost of
Operations 9,158.47
Estimated Total Damages $116,442.87

Since the 1988 report, two additional years of actual operations have occurred. In addition, revised expenses per acre and revised sugar production per acre have been supplied by Naquin Bros., Inc.
Table 1 presents the information for the years 1986 to 1990 and the average for these years. The average net income for 1986-90 is used to project the net income loss for 1991-2010 presented in Table 2. Also, the discounted present value of the projected net income stream from 1991 to 2010 is calculated.
The estimated increased cost of operations is the same as projected in the April, 1988 report.
Table 3 presented the estimated Total Damages based upon income lost 1986-1990, the discounted present value of income from 1991 to 2010 and the increased costs of operations.

Table 1. Estimate of Net Income Lost 1986-1990, Naquin Bros., Inc.
Fiscal Year 1986 1987 1988 1989 1990 Average
Pounds Sugar per Acre 5,657.00 6,072.00 6,253.00 6,222.00 6,946.00 6,230.00
 less 40% Mill Share 2,262.80 2,428.80 2,501.20 2,488.80 2,778.40 2,492.00
Sugar for Landlord and Tenant 3,394.20 3,643.20 3,751.80 3,733.20 4,167.60 3,738.00
 less 20% Rent 678.84 728.64 650.36 746.64 833.52 747.60
Naquin Bros. Share 2,715.36 2,914.56 3,001.44 2,986.56 3,334.08 2,990.40
Tons Cane per Acre 31.43 33.73 34.74 34.57 38.59 34.61
Sugar Price ($/Lb.) $0.197309 $0.204432 $0.211145 $0.210704 $0.224200 $0.209558
Molasses ($/Ton) $0.705930 $0.658560 $0.611770 $0.733400 $0.302400 $0.642412

*71
Hoisting Allowance ($/Ton) $0.385000 $0.385000 $0.385000 $0.385000 $0.385000 $0.385000
Hauling ($/Ton) $2.10 $2.10 $2.10 $2.10 $2.10 $2.10
INCOME
Sugar $535.76 $595.83 $633.74 $629.28 $747.50 $626.66
Molasses $22.19 $22.22 $21.25 $25.35 $19.39 $22.23
Hoisting $12.10 $12.99 $13.37 $14.86 $13.33 $13.33
Hauling $66.00 $70.84 $72.95 $72.59 $81.04 $72.68
Total Income per Acre $636.05 $701.87 $741.32 $740.53 $862.78 $734.91
Income Acres 18.82 18.82 18.82 18.82 18.82 18.82
Total Income per Year $11,967.89 $13,206.43 $13,948.63 $13,933.80 $16,234.09 $13,827.98
Variable Expenses per Acre $194.00 $234.64 $197.86 $204.45 $244.56 $216.90
Expense Acres 26.42 26.42 26.42 26.42 26.42 26.42
Total Expense per Year $5,125.67 $6,437.21 $5,227.66 $5,401.77 $6,461.52 $5,730.77
Estimated Net Income Lost $6,842.22 $6,769.21 $8,720.97 $8,532.03 $9,772.57 $8,097.21
Table 2. Projected Net Income 1991 to 2010
 Year Amount
 1991 $8,097.21
 1992 $8,097.21
 1993 $8,097.21
 1994 $8,097.21
 1995 $8,097.21
 1996 $8,097.21
 1997 $8,097.21
 1998 $8,097.21
 1999 $8,097.21
 2000 $8,097.21
 2001 $8,097.21
 2002 $8,097.21
 2003 $8,097.21
 2004 $8,097.21
 2005 $8,097.21
 2006 $8,097.21
 2007 $8,097.21
 2008 $8,097.21
 2009 $8,097.21
 2010 $8,097.21
Total Net Income $161,944.20
Discount Rate 10.50 %
Discounted
 Present Value $66,647.40
Table 3. Estimated Damages
Estimated Net Income Lost 1986-90 $40,637.00
Discounted Present Value 1991-2010 $66,647.40
Estimated Increased Cost of Operations $9,158.47
Estimated Total Damages $116,442.87

NOTES
[1] Following a judgment on rule wherein the sellers of the land were declared to be indispensable parties, plaintiffs amended their suit to join the sellers as defendants, and to allege a claim against them for any proceeds received by them from DOTD for loss of crops. Sellers Falgout and Heroman filed a cross claim against DOTD to recover for loss of crops. DOTD filed a cross claim against all sellers alleging a right to indemnity. On December 19 and 31, 1990, DOTD settled its cross claims with all sellers.
[2] Article I, Section 2 of the Louisiana Constitution of 1921 provided, in pertinent part:

Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid.
[3] See Exhibit 7.11 (abridged), attached as Appendix "A".
[4] Since we reduce the damage award to $55,798.16, the award of attorney's fees shall be based upon the amended damage award, and shall be $18,599.38.