**NOT DESIGNATED FOR PUBLICATION**

**STATE OF LOUISIANA**

**COURT OF APPEAL**

**FIRST CIRCUIT**

**2023 CA 0912**

PARISH OF LIVINGSTON

VERSUS

A&M INVESTMENT PROPERTIES, LLC

JUN 2 7 2024

Judgment Rendered: _____

\* \* \* \* \* \*

On Appeal from the Twenty-First Judicial District Court
In and for the Parish of Livingston
State of Louisiana
Docket No. 170193

Honorable Charlotte H. Foster, Judge Presiding

\* \* \* \* \* \*

Christopher M. Moody
Albert D. Giraud
Hammond, Louisiana

Counsel for Plaintiff/Appellee
Parish of Livingston


Thomas M. Lockwood
Baton Rouge, Louisiana

Counsel for Defendant/Appellant
A&M Investment Properties, LLC

\* \* \* \* \* \*

**BEFORE: McCLENDON, HESTER, AND MILLER, JJ.**

**McCLENDON, J.**

In this expropriation proceeding, the property owner appeals a judgment that dismissed its claims seeking additional compensation. We affirm.

## FACTS AND PROCEDURAL HISTORY

The history of the property relevant to this appeal begins in August of 2000, when Michelle Stogner and her late husband, through their business A&M Roofing and Sheet Metal, Inc. (A&M Sheet Metal), entered into a lease with an option to purchase property bearing municipal address 8670 Cook Road in Denham Springs, Louisiana (the property). The property consisted of a tract of land and a building situated thereon. In May of 2001, the Stogners purchased the property through a separate entity, A&M Investment Properties, LLC (A&M Investments). The Stogners formed A&M Investments, defendant-appellant herein, to serve as an investment property to "house a sheet metal company[,]" which they hoped to later sell to fund their retirement.

After A&M Investments purchased the property, the Stogners renovated the building and operated A&M Sheet Metal on the property until Mr. Stogner's death in 2009. Ms. Stogner continued running A&M Sheet Metal for the following five years, but closed A&M Sheet Metal in 2014 due to her health problems. In 2016, the building on the property flooded. Pertinent to this appeal, the office area of the building was never repaired after the flood, A&M Sheet Metal never resumed operations, and A&M Sheet Metal has never been a party to these proceedings.

On August 29, 2017, the Parish of Livingston (the Parish), plaintiff-appellee, held an "Open House Public Meeting" regarding the proposed improvement of Cook Road from Louisiana Highway 16 to Louisiana Highway 1026 in Livingston Parish (Cook Road project). Ms. Stogner attended the public meeting.

At some point in 2017, though it is unclear whether before or after the public meeting concerning the proposed Cook Road project, Ms. Stogner entered into negotiations for the possible lease or purchase of A&M Investments' sheet metal facility with Steven Schrieffer, President of Atlas Blowpipe and Sheet Metal Works (Atlas) in Metairie, Louisiana. Ultimately, due to the approval of the Cook Road project and the

2

impending expropriation of the subject property, Atlas decided not to lease or purchase A&M Investments' facility.

In August of 2020, the Parish initiated negotiations with A&M Investments for the purchase of a section of the property, designated as Parcel No. 2-3, and the rental of a second section of the property, designated as Parcel No. 2-3-C-1, during construction. The Parish's original proposal contemplated the acquisition and removal of the building and site improvements, resulting in a vacant tract of land, with A&M Investments retaining ownership of the portion of land not acquired by the Parish. The Parish commissioned two appraisers to perform appraisals. Both appraisals considered the cost of moving the equipment from the sheet metal facility, demolishing the building, and leaving A&M Investments with a portion of the remaining piece of land. One appraiser valued the building at $164,760.00 and the total amount of just compensation for the expropriation at $183,229.00, while the other appraiser valued the building at $165,281.00 and the total amount of just compensation for the expropriation at $178,821.00. The Parish made an offer of just compensation to A&M Investments in the amount of $183,229.00, representing the higher of the two appraisals.

In response to the Parish's offer of just compensation in the amount of $183,229.00, Ms. Stogner commissioned an appraisal (Ms. Stogner's appraisal) and made a counteroffer in the amount of $460,000.00 based on said appraisal. The Parish arranged for a third appraiser to review Ms. Stogner's appraisal. The Parish's third appraiser determined Ms. Stogner's appraisal did not support her counteroffer. The Parish advised Ms. Stogner that she could submit another appraisal to support her counteroffer, but she did not do so.

As the parties were unable to agree on just compensation, the Parish filed a petition on April 23, 2021 seeking to expropriate Parcel No. 2-3 and Parcel No. 2-3-C-1 pursuant to the general and traditional expropriation method set forth in LSA-R.S. 19:2, *et seq.* The Parish later amended its original petition to seek expropriation pursuant to the "quick taking" statutes, LSA-R.S. 48:441, *et seq.* Subsequently, the trial court ordered that the expropriated property be declared the property of the Parish upon the deposit of $183,229.00 into the court registry. Accordingly, the Parish deposited the sum of

3

$183,229.00 into the registry of the court, and the trial court signed an order directing payment of $183,229.00, plus all interest, to A&M Investments. Pursuant to a request made by A&M Investments, the trial court's order explicitly stated that said payment did not prejudice the parties' rights to contest and litigate the issue of just compensation.

On June 7, 2021, A&M Investments filed an answer and reconventional demand seeking additional compensation for the expropriated property and the building and equipment located thereon. A&M Investments argued the building was "a furnished and operational sheet metal fabrication facility" containing multiple pieces of heavy equipment attached both to the foundation of the building and to the three-phase electrical system and air lines necessary for operation. A&M Investments further alleged the pending expropriation caused it to lose the opportunity to lease the building and equipment. Continuing, A&M Investments argued that due to the costs associated with equipping the property for sheet metal fabrication, the facility had "tremendous future sale and rental value . . . which . . . will be lost . . . once the building is demolished and the equipment and infrastructure required for its operation are disconnected and removed." A&M Investments concluded:

> [A&M Investments] seeks and is entitled, accordingly, to judgment herein of an additional sum, over and above the monies deposited by [the Parish] into the registry of this Court, to compensate [A&M Investments] both to [the] full extent of the loss of the structure on and the land comprising the Expropriated Property, as well as for: (a) the cost of acquiring an alternate building, either by purchasing, building, or renting an existing building on an alternate site; (b) the cost of retrofitting that alternate building with the three-phase electrical system and air lines necessary for the operation of the equipment currently housed on the Expropriated Property; (c) the removal of that equipment from the Expropriated Property, the transportation of same to its new location, and the reinstallation of same therein; (d) the monthly rentals lost as a result of [A&M Investments'] inability to rent the Expropriated Property after receiving first notice of its expropriation; and (e) all other expenses related to [A&M Investments'] re-establishment of its sheet metal fabrication shop, all as will be proven at the trial of this case.

A&M Investments later filed a motion seeking leave of court to file a supplemental reconventional demand. A&M Investments alleged therein that the Parish was required to provide A&M Investments with relocation services and payments; a reasonable sum sufficient to compensate A&M Investments to the full extent of the loss of the structure located on the expropriated property and the land comprising the expropriated property;

4

monetary damages to compensate A&M Investments for the cost of re-establishment of the sheet metal fabrication shop; and legal interest.[1]

On February 4, 2022, the Parish filed an expedited motion for alternative relief seeking the removal of A&M Investments' movable property from the expropriated property. The Parish maintained that A&M Investments received notice to vacate the building, but had not done so. As a result, various pieces of A&M Investments' equipment were encroaching on the Parish's purchased right-of-way and impeding the Cook Road project. The Parish further alleged that although it had proposed various solutions to the issue, A&M Investments had not agreed to any of the Parish's proposed solutions. Specifically, the Parish alleged it had offered to move the equipment to a location of A&M Investments' choice, but A&M Investments would not choose a relocation site; the Parish then offered to auction the equipment, but A&M Investments would not agree to an auction. Alternatively, the Parish suggested that, rather than demolish the entire building as originally planned, the Parish could move the equipment to the back portion of the building, which was not encroaching on the newly purchased right-of-way, leave that portion of the building standing, and seal it. As A&M Investments also refused to respond to this suggestion, the Parish sought the relief of the trial court.

Following an April 25, 2022 hearing, the trial court executed a May 21, 2022 written judgment granting the Parish's motion for alternative relief. The May 21, 2022 judgment authorized the Parish to move the equipment "to the back of [A&M Investments'] building and seal off that portion of the building and proceed with demolition of the balance of the building in order to clear the right-of-way necessary to start construction." Thereafter, the front portion of the building was demolished, and the remaining portion of the building was resurfaced and sealed. However, litigation continued regarding the equipment remaining on the expropriated property. The Parish filed a second amended petition on August 1, 2022, alleging therein it had learned during the proceedings that certain pieces

---

[1] The record does not contain an order of the trial court accepting the supplemental reconventional demand into the record. However, the Parish answered the supplemental reconventional demand and generally denied the allegations contained therein on August 22, 2022.

5

of the equipment constituted component parts[2] of the immovable property, and consequently, were subject to expropriation. Thus, the Parish sought a court order directing an additional deposit in the court registry in the amount of the appraised value of said equipment. A&M Investments opposed the Parish's supplemental petition, arguing the Parish's requests therein violated La. Const. Art. I, §4(C), which prohibits the taking of personal effects other than contraband.

Bearing on the issues before us on appeal, prior to trial, the Parish sought partial summary judgment providing that the before-acquisition fair market value of the expropriated property was $183,229.00, consistent with the higher of the Parish's two appraisals. A&M Investments filed a memorandum in opposition to the Parish's motion for partial summary judgment. A&M Investments stated therein that it would not offer evidence to dispute the Parish's valuation and would stipulate to the relief the Parish sought, if the partial summary judgment was entered "in a manner that makes clear that it will not have the effect of adjudicating [its] claim that it be compensated to the full extent of its loss[.]" The trial court granted the motion for partial summary judgment, finding "that the $183,229[.00] amount deposited by [the Parish] into the registry of the court is the before-acquisition fair market value of the expropriated property[.]" In the same judgment, addressing the Parish's claims that some of the equipment remaining on the expropriated property constituted component parts subject to expropriation, the trial court ordered A&M Investments to show cause why the equipment remaining on the expropriated property should or should not be recognized as component parts. Ultimately, however, all of A&M Investments' equipment was moved to the remaining portion of the building before trial began, with the exception of one 9x14 Cincinnati brake press.

At the outset of the January 18, 2023 bench trial, the parties and the court agreed that, in light of the trial court's partial summary judgment establishing the before-acquisition fair market value of the expropriated property in the amount of $183,229.00, the only issue remaining to be determined was whether A&M Investments had been justly compensated, or alternatively, was entitled to additional damages in excess of the before-

---

[2] The Parish's second amended petition referred to this property as "immovable by destination." However, the Parish later conceded the proper terminology was "component part." For ease of reading and correctness, we use the term "component part" throughout.

acquisition fair market value of the expropriated property. At trial, A&M Investments offered the testimony of Ms. Stogner; Mr. Schrieffer; Norbert Schexnayder, Jr., A&M Investments' real estate appraiser; Charles McBride, the Right of Way Administrator for the Department of Transportation and Development in Louisiana; and Roger Stogner, a retired sheet metal worker. The Parish offered the testimony of the two real estate appraisers commissioned to appraise the property on the Parish's behalf, Roberto Aguilar and Angela Lemoine-Lakvold; Barbara Baldwin, the right-of-way agent for this expropriation; and Kresten Brown, a professional civil engineer. In addition to witness testimony, numerous documents concerning the expropriation and the circumstances surrounding same were offered as exhibits.

The three real estate appraisers testified as experts in their field. Mr. Schexnayder, Mr. Aguilar, and Ms. Lemoine-Lakvold all agreed the before-acquisition fair market value of the property the Parish sought to acquire, including the building, amounted to $183,229.00, as determined by the trial court's partial summary judgment prior to trial. The real estate appraisers also agreed that A&M Investments' remaining tract of land was too small to serve its previous purpose as a sheet metal fabrication shop. However, the experts disagreed as to the issue remaining for determination at trial: whether A&M Investments was entitled to compensation in excess of the before-acquisition market value of the expropriated property. While Mr. Aguilar and Ms. Lemoine-Lakvold believed that A&M Investments had been justly compensated by the before-acquisition fair market value of the property, and therefore was not entitled to additional compensation, Mr. Schexnayder disagreed.

With respect to severance damages, which are awarded to compensate a property owner for a proven decrease in the value of that part of his property that remains after a taking,[3] Mr. Aguilar and Ms. Lemoine-Lakvold testified the Parish's partial expropriation

---

[3] Damages to the remaining property are sometimes characterized as "severance damages," a term which describes the compensable damages that flow from the partial expropriation of a tract of land. Severance damages are the damages to the remainder of a tract of land resulting from a partial taking, and are ordinarily calculated as the difference between the market value of the remaining property immediately before and immediately after the taking. Severance damages are awarded to compensate a property owner for a proven decrease in the value of that part of his property that remains after a taking. **Terrebonne Parish Consolidated Government v. Richard**, 2015-0728 (La.App. 1 Cir. 6/2/16), 196 So.3d 684, 688, writ denied, 2016-1237 (La. 10/17/16), 207 So.3d 1065.

7

was proper and no severance damages were due. Mr. Aguilar testified that expropriation of the entire tract of land was not appropriate because the remaining property was a "viable, usable piece of land" that could be used for residential or commercial purposes. Ms. Lemoine-Lakvold's opinion was consistent with Mr. Aguilar's. Mr. Schexnayder conceded that the remaining tract of property had value, but testified it was too small for industrial use. Mr. Schexnayder further testified the remaining property was unsuitable for residential use because it was subject to inundation and located in an industrial area. Thus, Mr. Schexnayder believed the most likely purchaser would be an adjoining property owner and not a single end-user.

Regarding whether A&M Investments had otherwise been compensated to the full extent of its loss, Mr. Aguilar and Ms. Lemoine-Lakvold testified that given the poor condition of the facility and the lack of a lease establishing that the facility could be rented in that condition, no further compensation was due. Recalling his June 10, 2020 evaluation of the facility, Mr. Aguilar testified that the office area was "completely mold infested" and recounted the presence of rust and leaks in the warehouse area. He agreed the building was "uninhabitable[.]" Mr. Aguilar concluded that, in his opinion, "it would be very difficult to inhabit that and run a full operational business in it." Ms. Lemoine-Lakvold testified that she observed individuals running equipment in the facility on the day of her inspection, but A&M Investments did not provide her with a lease as proof that the facility was in use. Thus, neither Mr. Aguilar nor Ms. Lemoine-Lakvold believed that A&M Investments was entitled to additional compensation in excess of the before-acquisition fair market value of the expropriated property.

In contrast, Mr. Schexnayder testified that A&M Investments was not compensated "to the full extent of [its] loss." Although Mr. Schexnayder testified that the before-acquisition market value of the property "was accurate as it took into consideration the condition of the property[,]" specifically "[t]hat [it] had flooded," that "there was mold infestation[,]" and that "items of deferred maintenance [] were inherent in the buildings[,]" Mr. Schexnayder nevertheless testified that A&M Investments' facility was "an operating sheet metal fabrication facility prior to the taking[.]" Mr. Schexnayder stated that his opinion was based on being told the facility was an owner-operated

8

business at the time of the taking, and on his observation of "obvious evidence" that sheet metal had been recently cut during his June 30, 2021 inspection. While Mr. Schexnayder did not observe anyone working in the facility during his inspection, he noted scraps of metal around the bending machines and sheets of metal stored in the building. Thus, Mr. Schexnayder believed the $183,229.00 valuation based on Mr. Aguilar and Ms. Lemoine-Lakvold's appraisals did not compensate A&M Investments to the full extent of its loss, because that valuation did not consider the displacement of A&M Investments, nor did it account for the cost of replacing the utility of the sheet metal fabrication facility. Mr. Schexnayder opined that the Parish should reimburse A&M Investments for either the purchase of a new tract of land and the construction of a new building, or the purchase of an existing structure suitable for use as a sheet metal fabrication facility. Mr. Schexnayder estimated that the "minimum" replacement cost for a new structure would be $680,176.00, based on the deposition of general contractor, Jack Green. Mr. Schexnayder also testified that he attempted to locate an alternate suitable site, but many buildings were unsuitable due to the weight of the equipment.

In addition to the expert testimony of the real estate appraisers, Ms. Stogner testified A&M Investments' sheet metal facility was "operable." She stated, "Everything operated. As far as like a business, opened up and conducting . . . that was all in process to get going. It takes time for that stuff to happen with a business." Ms. Stogner's brother-in-law, Roger Stogner, who is a retired sheet metal worker, also testified. He denied the building was uninhabitable and stated it looked exactly like other sheet metal facilities.

With respect to whether A&M Investments was entitled to relocation costs, A&M Investments offered the testimony of Charles McBride, the Right of Way Administrator for the Department of Transportation and Development in Louisiana. Mr. McBride testified that the owner of an expropriated building is entitled to relocation benefits to move the owner's personal property from the expropriated building, regardless of whether a business was operating at the time of the expropriation. However, Mr. McBride testified that the owner is obligated to notify the expropriating authority of the owner's chosen relocation site. When asked by the Parish whether a business is "entitled to have a brand new building built and all the equipment relocated there, if they had not been an

9

operating business?" Mr. McBride responded, "In general, we do - - we do not pay to build replacement buildings for businesses that are not operating or making money. They have to be making money." Mr. McBride testified he did not believe A&M Investments was an operating business at the time of the expropriation, and therefore, he would not expect the state to be required to construct a new building, move the equipment, and prepare the equipment for operation. When asked whether it was reasonable for the Parish to pay fair market value for the equipment remaining on the expropriated property rather than pay to move it, Mr. McBride testified this was a "unique situation," but it would be reasonable.

On this point, Mr. Aguilar's testimony on behalf of the Parish was consistent with Mr. McBride's testimony on behalf of A&M Investments. Mr. Aguilar testified, "when you have an owner-occupied property that is a viable, operating, functioning business and if we affect them to where they cannot function in that particular location, then we try to reestablish them [in] a new location[.]"

Barbara Baldwin, the right-of-way agent for this expropriation, also testified on behalf of the Parish. Consistent with Mr. McBride and Mr. Aguilar, Ms. Baldwin testified that if A&M Investments was found to be an owner-occupied operating business, it would have been entitled to an additional $25,000.00 in reestablishment benefits. However, A&M Investments was not determined to be an owner-occupied operating business Nevertheless, Ms. Baldwin testified the Parish offered to move the equipment and to pay three months of rent to store the equipment. Ms. Baldwin testified the storage site the Parish suggested would have cost $5,000.00 per month in rent and was not big enough to accommodate operation of the equipment. Ms. Baldwin also testified the Parish's offer to move the equipment did not include reinstallation or moving the equipment a second time from the storage facility to a location where it could be used. When Ms. Stogner did not agree to any of the locations the Parish proposed, the Parish had the equipment appraised and offered to pay the fair market value of the equipment.

Regarding A&M Investments' claim that it lost the opportunity to sell or lease the sheet metal facility to Atlas due to the expropriation, Ms. Stogner and Mr. Schrieffer both testified they began negotiations prior to September of 2017. However, the Parish

correctly pointed out that the earliest emails between Ms. Stogner and Mr. Schrieffer, and the drafts of contracts for the proposed lease or purchase of the sheet metal facility, were dated September of 2017. As the documentary evidence supporting Ms. Stogner and Mr. Schrieffer's testimony post-dated the August 29, 2017 public meeting, the Parish questioned the legitimacy of the negotiations between A&M Investments and Atlas.

On this point, Ms. Stogner testified she and Mr. Schrieffer were "speaking quite some time" prior to the August 29, 2017 public meeting. She stated she did not understand the extent to which the potential expropriation would affect her property until 2019 or 2020, so she continued negotiating with Mr. Schrieffer after the public meeting. Consistent with Ms. Stogner's testimony, Mr. Schrieffer testified he became acquainted with Ms. Stogner when he was searching for a Livingston Parish location that would enable him to expand his business to include heavy gauge metal work. Mr. Schrieffer stated Atlas spent approximately $65,000.00 cleaning A&M Investments' building and ensuring the equipment was operational. According to Mr. Schrieffer, if the expropriation issue was resolved, the $65,000.00 would "go against" the lease or purchase of the property, building, and equipment, and Atlas would then operate from that location. Mr. Schrieffer further testified that while Ms. Stogner advised him the building appraised for one million dollars, "seven, eight hundred thousand was kind of a number in my mind, and I never shared that with [Ms. Stogner]. I didn't want her to know that. I was going to tell her it would be worth more like four. But that's kind of the number in my head that we thought would be a good deal for us."

The Parish offered the testimony of Kresten Brown, the professional civil engineer who worked on the expropriation. Mr. Brown testified that it should have been evident to Ms. Stogner at the public meeting that the proposed Cook Road project would affect A&M Investments' property, although she would not have been notified of the exact plans "specifically in writing" until she was contacted for the negotiation process. In addition, the Parish relied on two separate emails that cast doubt on Ms. Stogner's credibility. Specifically, the emails reflected that Ms. Stogner suggested A&M Investments and Atlas could execute a "side lease" of the sheet metal facility for an inflated value, which Ms. Stogner could then present to the Parish to inflate the value of the expropriated property.

11

The Parish offered a September 28, 2017 email Mr. Schrieffer sent to Ms. Stogner which stated, in pertinent part:

> I spoke with our attorney on inflating the monthly rent numbers in case a portion / all of the property was taken because of the proposed road extension. He informed me that in the event the property was taken by imminent domain[,] the [P]arish would assess the value of the property at that time and would have to reimburse the owner of the fair market value of it. In other words[,] inflating the monthly rent would not make a difference.

The Parish also offered into evidence an October 12, 2017 letter Ms. Stogner addressed to an attorney, "Peter John[,]" at "ONEAL LEGAL[.]" Ms. Stogner's October 12, 2017 letter provided, in pertinent part:

> I have agreed to lease for $2,500.00 per month for the first year only in order for them to get things back in order to open for business (2-3 weeks) and some time to gain ground. I have been advised that the average going rate to lease an industrial building is about [$850.00] a square foot. As far as an exact number for a monthly lease amount, we have not discussed other than the going rate and the fact of having a "side lease" to present to the Parish only ($15,000[.00]/month) in the event they decide to start the Cook Road expansion which will necessitate the need for them to acquire my property. I do NOT trust them and that's just stating the facts. I have also been advised and presented with preliminary road expansion intentions but they cannot give details as to exactly when this should take place so I CANNOT wait and also miss out on a potential sale of my building and equipment. I feel this lease will be my best scenario for A&M as I am not able to operate for business myself due to health issues and underlying circumstances. I am open for any advice you may have for me.

Ms. Stogner testified that when she proposed the "side lease[,]" she believed that would be "no different than a cash sale and a counter letter." However, once she learned the "side lease" would be illegal, "that was the end of that, period." Mr. Schrieffer testified that $15,000.00 per month for a property that size was "probably pretty close to that amount[,]" but he wasn't willing to pay that amount. Mr. Schrieffer also testified that while he did not know what Ms. Stogner's intentions were, he "wouldn't have blamed her" if she was "using" him in order to inflate the value prior to expropriation.

Following trial, the trial court took the matter under advisement and requested post-trial memoranda from the parties. The trial court issued written reasons for judgment on February 24, 2023, declining to award A&M Investments damages in excess of the before-acquisition fair market value of the expropriated property. Thereafter, the trial court executed a written judgment on May 10, 2023, which provided, in pertinent part:

12

After presentation of the evidence and argument of counsel, the court took the case under advisement. On February 24, 2023, the court issued written reasons finding in favor of [the Parish] and against [A&M Investments] regarding [A&M Investments' claims] for business relocation damages, alleged lost value of the remaining parcel of land not expropriated, and attorney's fees, and dismissing those claims, with prejudice, and partially in favor of [the Parish] and against [A&M Investments] regarding [A&M Investments'] claim for damages associated with movable equipment of [A&M Investments], awarding [A&M Investments] the fair market value of its 9x14 Cincinnati brake press that remains on the expropriated property, but dismissing said claim for damages regarding all other movable property, with prejudice;

Considering the above;

**IT IS HEREBY ORDERED, ADJUDGED[,] AND DECREED** that there be and hereby is judgment rendered herein in favor of [the Parish] and against [A&M Investments] dismissing [A&M Investments' claims] for business relocation damages, alleged lost value of the remaining parcel of land not expropriated, and attorney's fees, with prejudice, at [A&M Investments'] costs;

**IT IS FURTHER HEREBY ORDERED, ADJUDGED, AND DECREED** that there be and hereby is judgment rendered herein partially in favor of [the Parish] and against [A&M Investments] awarding [A&M Investments] $22,000.00 as the fair market value of its 9x14 Cincinnati brake press that remains on the expropriated property with ownership of brake press to transfer to [the Parish] upon payment to [A&M Investments] of that amount, and dismissing any and all other of [A&M Investments'] claims for damages regarding all other of its movable property, with prejudice, at [A&M Investments'] costs.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that this judgment be and the same hereby is designated as a final judgment, pursuant to [LSA-C.C.P. art. 1915].

On May 17, 2023, A&M Investments filed a motion to suspensively appeal the May 10, 2023 judgment.

## STANDARD OF REVIEW

In an expropriation proceeding, the determination of what amount will compensate an individual "to the full extent of his loss" must be made on the basis of the facts of each case and in accord with the uniqueness of the property right taken. Such findings by the trial court will not be disturbed in the absence of manifest error. See **Naquin v. Department of Transportation & Development**, 604 So.2d 62, 65-66 (La.App. 1 Cir.), writ denied, 608 So.2d 169 (La. 1992). When applying the manifest error standard of review, an appellate court must apply a two-part test to a factfinder's factual determination: (1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court; and (2) the appellate court must further

13

determine that the record establishes the finding is not clearly wrong or manifestly erroneous. **Lafayette City-Parish Consolidated Government v. Person**, 2012-0307 (La. 10/16/12), 100 So.3d 293, 297-98. Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. **Lewis v. Fowler**, 2018-0365 (La.App. 1 Cir. 9/24/18), 259 So.3d 364, 367.

This test requires a reviewing court to review the record in its entirety to determine manifest error. This court's determination is not whether the factfinder was correct, but whether the factfinder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Thus, where there are two permissible views of the evidence, the factfinder's choice cannot be manifestly erroneous or clearly wrong. **Walton v. State Farm Mutual Automobile Ins. Co.**, 2018-1510 (La.App. 1 Cir. 5/31/19), 277 So.3d 1193, 1196. Further, the rule that questions of credibility are for the trier of fact applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. **Lewis**, 259 So.3d at 367.

## LAW

In 1974, the Louisiana Constitution was amended to provide that, in an expropriation, "the owner shall be compensated to the full extent of his loss." LSA-Const. art. I, § 4(A)(5). There is no specific formula set forth by the legislature to aid courts in determining the "full extent of loss." The Constitution states only: "Except as otherwise provided in this Constitution, the full extent of loss shall include, but not be limited to, the appraised value of the property and all costs of relocation, inconvenience, and any other damages actually incurred by the owner because of the expropriation." LSA-Const. art. I, § 4(A)(5); **St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc., LLC**, 2017-0434 (La. 1/30/18), 239 So.3d 243, 252-53.

14

Jurisprudence indicates that the landowner must be compensated not merely with the market value of property taken and severance damage to his remainder, but to the full extent of his loss and placed in as good a position pecuniarily as he enjoyed prior to the taking. **Williams v. City of Baton Rouge**, 98-1981 (La. 4/13/99), 731 So.2d 240, 249. Jurisprudence reflects that compensable items of damages in expropriation cases may include the loss of business, replacement costs, relocation costs, inconvenience, and loss of profits. See **City of Baton Rouge/Parish of East Baton Rouge v. Broussard**, 2002-0166 (La.App. 1 Cir. 12/31/02), 834 So.2d 665, 667-68, writ denied, 2003-0652 (La. 5/30/03), 845 So.2d 1056. Particularly regarding business losses, where it is proven by a preponderance of the evidence that a business sustained an actual economic loss because of the expropriation, damages for incidental and consequential loss must be awarded to fully compensate the owner. See **State, Department of Transportation & Development v. Dietrich**, 555 So.2d 1355, 1358 (La. 1990). In such cases, proof of economic loss may be determined by various methods, and it may exceed the market value of the property. **Dietrich**, 555 So.2d at 1359. In unusual situations, the market value of the expropriated property constitutes insufficient compensation and the expropriatee is entitled to replacement value, the amount necessary to reconstitute the property. However, an award of replacement value is the exception, not the rule. **Department of Transportation & Development v. Oswald**, 27,752 (La.App. 2 Cir. 12/6/95), 665 So.2d 668, 671, writ denied, 96-0445 (La. 3/29/96), 670 So.2d 1231.

Where the landowner challenges the amount of just compensation for an expropriation, the landowner bears the burden of proving a greater value by a preponderance of the evidence. See **State, Department of Transportation & Development v. Munson**, 2014-0492 (La.App. 1 Cir. 1/21/15), 169 So.3d 426, 432, writ denied, 2015-0299 (La. 4/24/15), 169 So.3d 358; **City of Baton Rouge v. Mucciacciaro**, 2021-0656 (La.App. 1 Cir. 5/25/22), 342 So.3d 955, 963, writ denied, 2022-01172 (La. 11/1/22), 349 So.3d 2. Speculation, conjecture, mere possibility, and unsupported probability are not sufficient to support a judgment. **Mucciacciaro**, 342 So.3d at 963.

## DISCUSSION

To review the judgment, we examine the entire record, but we cannot set aside the trial court's judgment in the absence of manifest error. Here, the trial court's judgment followed a bench trial, where the trial court examined evidence, evaluated the credibility of multiple witnesses, and weighed the probative value of these assertions. See **St. Bernard Port**, 239 So.3d at 252. As the party challenging the amount of just compensation deposited by the Parish, A&M Investments bore the burden of proving at trial, by a preponderance of the evidence, that it was entitled to a higher value. See **Mucciacciaro**, 342 So.3d at 966. On appeal, A&M Investments seeks damages in excess of the established before-acquisition fair market value of the expropriated property. In opposition to A&M Investments' appeal, the Parish argues A&M Investments cannot prevail on appeal because the record contains conflicting evidence and a reasonable basis for the trial court's rulings, such that the trial court did not manifestly err. Based upon our consideration of the record and the legal issues before us, we must agree with the Parish.

We begin with A&M Investments' arguments that the trial court erred in failing to award it a sum sufficient to compensate it for the lost opportunity to sell or lease the sheet metal facility; the cost of a replacement facility; the cost of retrofitting a replacement facility to accommodate sheet metal fabrication; and the cost of moving and reinstalling A&M Investments' equipment. Underlying all of these arguments is a presumption that A&M Investments' sheet metal fabrication facility was, at the time of the expropriation, "fully-operational[,]" or, for purposes of this discussion, "fully-functional."[4] Thus, in considering the merit of these arguments, we point out that, while A&M Investments is entitled to be compensated to the full extent of its loss, it is only entitled to damages that were "actually incurred by the owner because of the expropriation." LSA-Const. art. I, § 4(A)(5); see **St. Bernard Port**, 239 So.3d at 252-53. Phrased differently, A&M Investments is not entitled to compensation for a lost

_____

[4] Although the parties' arguments and the testimony were phrased in terms of whether the facility was "operational[,]" to avoid confusion of the issues of whether this matter involved a business considered "operational" in the legal context of an expropriation, versus a sheet metal fabrication facility that was practically "operational," we refer in our discussion to the condition of the sheet metal facility as "functional" or "not functional."

opportunity that did not exist, nor is it entitled to compensation for a fully-functional sheet metal fabrication facility if it did not possess one prior to the expropriation. Thus, central to these arguments is a dispute as to whether, at the time of the expropriation, A&M Investments' sheet metal fabrication facility was "fully-operational[,]" or, for purposes of this discussion, "fully-functional."

In this matter, the record reflects contradictory evidence with respect to whether A&M Investments' sheet metal fabrication facility was fully-functional at the time of the expropriation, such that two permissible views of the evidence exist. Ms. Stogner, her brother-in-law, Roger Stogner, Mr. Schrieffer, and Mr. Schexnayder testified that the sheet metal facility was functional; however, the Parish's two expert witnesses, Mr. Aguilar and Ms. Lemoine-Lakvold, disagreed with Mr. Schexnayder's expert opinion, and opined that the sheet metal facility was not functional at the time of the expropriation. Mr. Aguilar described the sheet metal facility as rusting, leaking, "completely mold infested[,]" and uninhabitable. Based on this record, the trial court could have found that the sheet metal facility was not functional at the time of the expropriation. Where there are two permissible views of the evidence, the factfinder's choice cannot be manifestly erroneous or clearly wrong. **Walton**, 277 So.3d at 1196. Accordingly, A&M Investments' argument that it possessed a fully functional sheet metal fabrication facility, which had a value in excess of the before-acquisition fair market value of the expropriated property, and that it should have been compensated for the loss of same, fails.

A&M Investments' argument that the expropriation deprived A&M Investments of the opportunity to sell or lease the sheet metal fabrication facility also fails due to the presence of contradictory evidence in the record. As argued by the Parish and pointed out by the Parish's appraisers, A&M Investments failed to produce a written lease or a purchase agreement in effect at the time of the expropriation. Thus, the only evidence supporting an actual loss of rental or sale income is the testimony of Ms. Stogner and Mr. Schrieffer. However, Mr. Schrieffer and Ms. Stogner's testimony was called into question by the documentary evidence of the negotiations. Of particular note was Ms. Stogner's explicit proposal that Atlas and A&M Investments execute a "side lease" for the purpose of inflating the value of the facility. The trial court specifically stated in its reasons for

judgment both that it was "unpersuaded" by Mr. Schrieffer's testimony, and that "the evidence supports that Ms. Stogner only began communicating with Mr. Schrieffer regarding the defunct sheet metal business after learning of the expropriation in an attempt to inflate the value of the business." Where factual findings are based on determinations regarding the credibility of witnesses, the trier of fact's findings demand great deference and are virtually never manifestly erroneous or clearly wrong. **Marcello v. Jo-Blanche Corp.**, 2020-1113 (La.App. 1 Cir. 6/4/21), 330 So.3d 632, 639, <u>writ denied</u>, 2021-01666 (La. 1/19/22), 331 So.3d 330. Additionally, in light of Mr. Aguilar's testimony that the facility was "uninhabitable[,]" the record contains contradictory evidence as to whether the facility was in a condition to be leased or sold for an amount in excess of the before-acquisition fair market value. Thus, we cannot say that the trial court manifestly erred in finding that A&M Investments failed to prove any lost opportunity to sell or rent its facility. Accordingly, A&M Investments' argument that it is entitled to additional compensation for the lost opportunity to potentially sell or lease its facility fails.

To the extent A&M Investments argues it is entitled to the replacement cost of the sheet metal facility because it held same as an investment, and has been deprived of the sale or rental income from investment by the expropriation, we disagree. On this point, A&M Investments essentially argues that, because it was formed for the purpose of generating income from the sale or rental of its sheet metal facility, in order for the Parish to compensate it to the full extent of its loss and to place it in financial circumstances equivalent to those it enjoyed before the expropriation, the Parish must compensate it with the cost of recreating an equivalent sheet metal fabrication facility, which it could then sell or rent for income. While the record does not contain any evidence disputing A&M Investments' assertion that it is an "investment" business and owned the sheet metal fabrication facility at issue as investment property, the jurisprudence does not support A&M Investments' claim that it is entitled to replacement value under the circumstances presented.

As noted above, in unusual situations, the market value of the expropriated property constitutes insufficient compensation and the expropriatee is entitled to

18

replacement value. However, an award of replacement value is the exception, not the rule. **Oswald**, 665 So.2d at 671. This rule derives from the Louisiana Supreme Court's statement in **State Through Department of Highways v. Constant**, 369 So.2d 699, 706 (La. 1979). In **Constant**, the state expropriated the entire loading and parking area of the defendants' marina operation. **Constant**, 369 So.2d at 701. As no other land in the vicinity could be used for loading and parking, this taking essentially destroyed the marina business operations on the entire parent tract. **Constant**, 369 So.2d at 701. Thus, under the evidence in that record, the Supreme Court concluded that, "Without the replacement of their loading area, their marina business operations will be substantially destroyed." **Constant**, 369 So.2d at 702.

However, the Supreme Court in **Constant** made clear that the award of replacement value was appropriate based on the unique circumstances presented therein. The Supreme Court repeatedly referenced "the circumstances and the nature of the property taken" and "the evidence in the present record." **Constant**, 369 So.2d at 706-07. The Supreme Court further stated:

> We do not, by these rulings, announce any general principle that replacement cost is always the most appropriate measure of awarding a landowner compensation for the taking of a physical asset used in his business....
>
> Generally, we assume, the landowners may be compensated fully by other approaches than by awarding them the replacement cost of the improvement taken, *especially where (unlike the present instance) the property is not shown to be both unique in nature and location and also indispensable to the conduct of the landowners' business operations on the site from which a part is taken*.

(Emphasis added); **Constant**, 369 So.2d at 706.

As the party challenging the amount of just compensation deposited by the Parish, A&M Investments bore the burden of proving, by a preponderance of the evidence, that it was entitled to a higher value. See **Munson**, 169 So.3d at 432. However, A&M Investments did not offer evidence establishing that the expropriated property was unique in nature and location, nor that it was indispensable to the conduct of business operations. We also note, in applying the rule set forth in **Constant**, our colleagues of the Second Circuit Court of Appeal have consistently found that rental properties were not unique and indispensable such that the landowner should be awarded anything other

19

than the fair market value and, where proven, stipulated rental losses. See **Department of Transportation & Development v. Lobel**, 571 So.2d 742, 745 (La.App. 2 Cir. 1990), writ not considered, 575 So.2d 360 (La. 1991); **Oswald**, 665 So.2d at 671. In **Lobel**, the trial court's written opinion noted that it did not consider the rental property a unique and necessary part of an ongoing business, considering it to be more in the nature of an investment. **Lobel**, 571 So.2d at 743. Like A&M Investments in this matter, the landowner in **Lobel** "referred to the expropriated rental units, not as his business, but as an investment." **Lobel**, 571 So.2d at 745. Similarly, in **Oswald**, 665 So.2d at 670, the parties disputed whether the rental property constituted a business or an investment. In **Oswald**, the Second Circuit cited to **Lobel** in support of its conclusion that the landowners were only entitled to the fair market value of the properties.[5] **Oswald**, 665 So.2d at 671. In this matter, we find A&M Investments' argument that it is entitled to the replacement value of its investment property similar to those made in **Oswald** and **Lobel**. Therefore, we find the trial court did not err in declining to award A&M Investments additional compensation for the replacement of its sheet metal fabrication facility.

A&M Investments further argues that the trial court erred in failing to order the Parish to provide A&M Investments with relocation services and to make all relocation payments required by the Relocation Assistance Act, LSA-R.S. 38:3101, *et seq*. In **Polk v. State, through Department of Transportation & Development**, 538 So.2d 239, 248 (La. 1989), the Louisiana Supreme Court explained that these statutes make available various forms of "relocation assistance" for persons who are "displaced" as the result of the acquisition of their property by a state agency for a program or project undertaken by that agency. However, **Polk** also noted that these statutes clearly envision a fair amount of agency discretion in this area, as the statutes authorize the award of such benefits, but do not require that they must be awarded in any particular case. See **Polk**, 538 So.2d at 251. Further, **Polk** alluded that a landowner who moves onto real property while negotiations are underway for the acquisition of that property in connection with a

---

[5] We also note this court's decision in **Mucciacciaro**, 342 So.3d 955, which awarded the appraised value for residential rental property, and did not consider or discuss an award of replacement value for same.

public project may be disqualified from receiving relocation expenses, if the landowner fails to satisfy their duty to minimize, or mitigate, their damages as much as possible. See **State, Department of Transportation & Development v. Nelken**, 628 So.2d 1279, 1282 (La.App. 3 Cir. 1993), writ denied, 634 So.2d 860 (La. 1994).

In this matter, both Mr. McBride, the Right of Way Administrator for the Department of Transportation and Development in Louisiana, and Ms. Baldwin, the right of way agent for the subject expropriation, testified that A&M Investments qualified as a displaced business. Mr. McBride further testified that if an owner's building is expropriated, and they have personal property situated in that building that has to be moved as a result of the expropriation, that person "is entitled to relocation benefits to move the property." Mr. McBride stated that this is true regardless of whether A&M Investments was an operating business at the time, but it is ultimately the landowner's obligation to tell the expropriating authority where they want the property moved to. Here, Ms. Baldwin's testimony, and the record as a whole, clearly establish that the Parish made numerous attempts to relocate A&M Investments' equipment. When A&M Investments failed to respond to same, the Parish filed the motion for alternative relief. In light of A&M Investments' refusal to identify a site for said relocation, the trial court issued the order directing that the equipment be relocated to the back remaining portion of the building and the building be sealed. The effect of this order was simply the relocation of A&M Investments' movable equipment to A&M Investments' property. Under the circumstances before us, and given the discretionary nature of the cited statutes, we cannot say that the trial court erred in ordering the relocation of A&M Investments' property to the remaining portion of the building. This argument fails.

A&M Investments further argues that the trial court erred in granting the Parish's request that it be allowed to purchase movable property in lieu of uninstalling, relocating, and reinstalling that equipment. As noted above, the Parish's second amended petition alleged that some of A&M Investments' equipment constituted component parts of the immovable property subject to expropriation. However, prior to trial, all of A&M Investments' movable property was moved and stored in the remaining portion of the building, with the single exception of the 9x14 Cincinnati brake press. Following trial, the

21

trial court's judgment awarded A&M Investments $22,000.00, the fair market value of the 9x14 Cincinnati brake press. On appeal, A&M Investments maintains that this portion of the trial court's judgment violated Louisiana Constitution article I, § 4, which prohibits the taking of personal effects other than contraband. This argument fails.

The laws governing immovable property are set forth in LSA-C.C. arts. 465, 466, and 467. Louisiana Civil Code article 466, captioned "Component parts of buildings or other construction[,]" provides:

> Things that are attached to a building and that, according to prevailing usages, serve to complete a building of the same general type, without regard to its specific use, are its component parts. Component parts of this kind may include doors, shutters, gutters, and cabinetry, as well as plumbing, heating, cooling, electrical, and similar systems.
>
> Things that are attached to a construction other than a building and that serve its principal use are its component parts.
>
> Other things are component parts of a building or other construction if they are attached to such a degree that they cannot be removed without substantial damage to themselves or to the building or other construction.

At trial, the engineer of the Cook Road project, Kresten Brown, testified that the 9x14 Cincinnati brake press remained in its original location "because it was not able to be moved without either destroying and getting into the existing building to remain or moving at somewhere" [sic]. This testimony provides a reasonable basis for finding that the brake press constitutes a component part of the property expropriated by the Parish, and is therefore immovable property subject to expropriation. Accordingly, the premise of A&M Investments' fourth assignment of error – that is, that the trial court erred in permitting the Parish to purchase movable property belonging to A&M Investments – fails. The trial court did not err in ordering the Parish to reimburse A&M Investments in the amount of $22,000.00 for the fair market value of the brake press, given that the record reflects the brake press was a component part of the expropriated property, and was therefore subject to the expropriation. This assignment of error lacks merit.

## REQUEST FOR ATTORNEY'S FEES

A&M Investments argues that the trial court erred in denying its claim for attorney's fees. Louisiana Revised Statutes 48:453(E) provides:

> Reasonable attorney fees may be awarded by the court if the amount of the compensation deposited in the registry of the court is less than the

22

amount of compensation awarded in the judgment. Such attorney fees in no event shall exceed twenty-five percent of the difference between the award and the amount deposited in the registry of the court.

At trial, A&M Investments maintained that it was entitled to an additional award of $783,908.00 as compensation for the expropriation. A&M Investments further maintained it was also entitled to an attorney's fee of twenty-five percent of the additional compensation, or $195,977.00, together with all compensable costs of court and legal interest. As we have affirmed the trial court's judgment denying A&M Investments' claims for additional compensation, there is no basis for an award of attorney's fees in the amount of $195,977.00. Further, while we note that the trial court properly ordered the Parish to reimburse A&M Investments an additional $22,000.00 in excess of the amount deposited in the registry of the court, representing the fair market value of the 9X14 Cincinnati Brake press that remains on the expropriated property, we cannot say that the trial court abused its discretion in declining to award attorney's fees based on the record before us.

## CONCLUSION

The trial court's May 10, 2023 judgment is affirmed. The costs of appeal are assessed against appellant, A&M Investment Properties, LLC.

**AFFIRMED.**